Eleanore DIEDENHOFEN–LEN-NARTZ, Volker Diedenhofen, Rüdiger Diedenhofen, Götz Diedenhofen, and Eva Eifeler Vermögensanlagen Gesellschaft bürgerlichen Rechts, a German Gesellschaft bürgerlichen Rechts, Plaintiffs,

v.

Ulrike DIEDENHOFEN, Defendant.

C.A. No. 2589–VCS.

Court of Chancery of Delaware, New Castle County.

Date Submitted: June 20, 2007.
Date Decided: Aug. 8, 2007.

Samuel A. Nolen, Rudolf Koch, Richards, Layton & Finger, P.A., Wilmington, DE, for Plaintiffs.

Kevin F. Brady, Connolly Bove Lodge & Hutz, LLP, Wilmington, DE; Marc J. Sonnenfeld, Elizabeth H. Fay, Morgan, Lewis & Bockius, LLP, Philadelphia, PA; Martina Bernstein, Morgan, Lewis & Bockius, LLP, Los Angeles, CA, for Defendants.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

This is the fifth civil action filed in an international struggle among the children of Gunter and Ingeborg Diedenhofen over the ownership and control of the family's assets. The five Diedenhofen children and their mother are *Gesellschafter*, or partners, in EVA Eifeler Vermogensanlagen ("EVA"). EVA is a *Gesellschaft burgerlichen Rechts*, a German

business entity similar in some respects to an American partnership. The plaintiffs in this case are EVA, and four of the five Diedenhofen children—Volker, Gotz, and Rudiger Diedenhofen and Eleanore Diedenhofen–Lennartz. All of the plaintiffs reside in Germany. The defendant is their sister, Ulrike Diedenhofen, who lives in Newark, Delaware. At the heart of the dispute is the plaintiffs' claim that EVA owns several North American entities and real estate holdings controlled by Ulrike and titled in the individual names of the Deidenhofen family members.

Through this lawsuit, the plaintiffs seek a full accounting of the assets under Ulrike's control, the imposition of a constructive or resulting trust on those assets, and money damages to rectify alleged fiduciary and contractual breaches. In addition, they also request a declaratory judgment that Ulrike's authority to manage, invest, or control the assets was validly and effectively terminated by EVA and the individual plaintiffs. The plaintiffs sued Ulrike in Delaware, they say, because she is a resident of this State, and conducts many of her activities regarding the North American assets in question from her home here.

At this stage in the proceedings, Ulrike has moved to dismiss or stay this case in favor of the earlier-filed actions already pending in the courts of Germany, Canada, and California. In support of that motion, Ulrike argues, among other things, that the well-known *McWane*[1] doctrine justifies a stay of the proceedings in this court.

In this decision, I grant Ulrike's motion. The plaintiffs' complaint in this case trailed a lawsuit filed in Canada, one pending in California, and two initiated in Germany. All of those actions involve substantially the same parties, and address substantially the same issues. They each put into question what assets are owned by EVA and ask for a determination of the rights and obligations of the family members with regard to the family's assets. Rather than add this court to the list of tribunals considering those issues, I conclude that a stay is warranted to allow these prior pending cases to run their course.

 Moreover, given the nature of this dispute, more complete, and, in my view, superior justice could be had by the parties in the German courts. It is undisputed that all of the dealings among the partners in EVA were conducted in German, and that all of the partners except for Ulrike live in that nation. Indeed, the EVA Partnership Agreement specifically contemplates that the courts in Gerolstein, Germany would be a fitting venue for resolving disputes among the partners. Finally, the plaintiffs base their claims on the proposition that an oral understanding was reached by the EVA partners whereby the Diedenhofens' North American assets would be titled in writing in the individual names of the family members but the equitable ownership would ultimately rest in EVA. They further contend that this practice is common, well-understood, and legitimate as a matter of German business law and custom.

I am an American-trained judge who speaks English. As such, it would be hubristic for me to conclude I would somehow do a better job of deciding this dispute than the German courts, whose jurists are steeped in German law and business context, and actually understand the witnesses in the case and the key documents. Rather, in addressing a case

1. *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Engineering Co.,* 263 A.2d 281 (Del. 1970).

so dependent on oral understandings and assertions that the legal titling of ownership documents is irrelevant in the German legal context, a German jurist would obviously be far better positioned to render a just decision. She could read documents—such as the EVA *Gesellschaftsvertrag,* or "Partnership Agreement," and the *Treuhandvertrag,* or "Trust Agreement," among the plaintiffs and Ulrike—for herself and not be dependent on translators. She could also read the relevant statutory and case law precedent for herself, and understand by her prior training the weight that should be given it. Perhaps most important, she could evaluate the credibility of witnesses based on her own understanding of their testimony. All of the plaintiffs and most of the witnesses in this case live in Germany and do not speak English as their native tongue. The subtlety of expression that would be crucial to interpreting their testimony would be lost upon me, as I am not fluent in German. In sum, by all reasonable metrics, a German court is best positioned to address a dispute among partners of a German partnership, who conducted their affairs entirely in German, and that involves a claim that their oral understandings override the written documents identifying the owners of particular assets.

Given that the German action predated this one, given that the plaintiffs here all reside within the jurisdiction of the German court in which the prior pending action was filed, and given that complete and superior justice can be done there, the *McWane* doctrine requires that a stay issue. In so concluding, it is also worth noting that *McWane* is a doctrine grounded in concepts of comity, not just efficiency. Of all the states of the union, Delaware should be most sensitive to the need to afford comity to the courts of the jurisdiction that charters an entity. As is well

understood, it is more than the statutory words on paper that give life to a system of entity law. Much often depends on the extent to which specific disputes are consistently handled by courts, thus giving businessmen predictable guidance by which to order their relations. In a situation when a German court can efficiently and expertly resolve a dispute involving partners to a German partnership, it would display precious little comity for this court to proceed with an expensive, inefficient, burdensome, error-hazarding, and unnecessary attempt to decide which German speakers and experts were telling the truth about business dealings conducted in German and about German laws, documents, and cultural and business understandings.

Furthermore, given that the plaintiffs themselves have filed prior pending actions in both California and Canada that address an important subset of the identical issues that the plaintiffs seek to litigate here, *McWane* also supports the entry of a stay in favor of those actions. These courts are as well positioned as this court to address the parties' overall dispute. Moreover, even if those actions do not address all the issues among the parties, the completion of those actions would substantially narrow any issues that remain to be litigated here.

## II. *Factual Background*

The Diedenhofen family consists of Gunter and Ingeborg Diedenhofen and their five children: Eleanore, Volker, Gotz, Rudiger and Ulrike. Since 1980, the family has owned EVA, with Ingeborg holding a 5/15 ownership stake and each of the five children holding a 2/15 interest. When EVA was formed, Gunter was named a partner with voting rights but without any equity in EVA. Until his death in 2005, Gunter managed EVA and held powers of

attorney and proxies from all of the family members except his wife.

Over the years, various assets in Europe, the United States, and Canada were accumulated by the Diedenhofen family. The precise ownership of those assets is the issue the plaintiffs wish to litigate. According to them, most of EVA's investments were in real estate, and all were made through single purpose entities organized under the laws of the nation in which the properties (or other assets) were located. For various legal and tax reasons, the plaintiffs say that the ownership structure of these entities did not always mirror EVA's structure. For example, Ulrike allegedly did not participate in certain of the European entities because she resided in the United States, and Ingeborg did not participate in some of the U.S. entities because of her German citizenship and other reasons. Most important, certain assets the plaintiffs claim are equitably owned by EVA are titled in the individual names of the Diedenhofen family members, though not in the same proportions as their ownership interests in EVA. Ulrike apparently disputes the plaintiffs' arguments, contending that the titling of the various assets reflects the economic reality intended by the family.

As Gunter grew older, his children assumed greater responsibility in managing EVA. In the early 1970s, Ulrike left Germany and moved to the United States to attend college, ultimately settling in Newark, Delaware. In the mid–1980s, Ulrike assumed responsibility for administering the North American assets of EVA because of her residence in this country.[2] Back in Germany, Ulrike's brothers, Gotz and Volker, also allegedly took on increased roles, beginning to assist in the management of EVA in 1996. Despite this assistance, Gunter Diedenhofen remained the managing partner of EVA until his death in April 2005.

Upon his father's death, Gotz filled the role of managing partner of EVA. The Diedenhofens also acted to ratify Ulrike's ability to administer the family's assets in North America by executing a Trust Agreement, i.e., the *Treuhandvertrag*. That Agreement was signed in May 2005 by the members of the Diedenhofen family and was backdated to January 1989 to retroactively authorize Ulrike's actions and empower her in the future. The Trust Agreement was drafted in German, but indicates that it was made in Newark, Delaware. It does not contain any choice of law or jurisdictional provisions.[3]

During the next year, tensions escalated within the Diedenhofen family concerning access to information about EVA and the family's holdings. At that time, Gotz and the other plaintiffs hoped to restructure

---

**2.** Those assets include: El Banco Vineyards, a California grape farming business; Verona Farming Partnership, a California crop farming business; Maare Holdings Ltd., an Ontario company invested in Canadian real estate; Real Property Company Club Village Madera, a California partnership that owns a shopping center; Office Building Crescent Heights, Ltd., a California partnership that owns a Los Angeles office building; Granite Beach Ltd., a California partnership that owns various real estate; Wild Meadows Ltd., a California partnership that makes agricultural land investments; Verona Oil and Gas L.P., a California limited partnership in the mining, oil, and gas extraction business; Orlando Outlet World, a Florida company that finances real estate; Secured Property Investors IV, L.P., a Virginia limited partnership that finances real estate; First Century Partnership II, III, L.P., a venture capital investment partnership; and Jamestown 18, L.P., Jamestown 19, L.P., Jamestown 20, L.P., and Jamestown 21, L.P., which are limited partnerships owning retail and office space in New York, Georgia, Virginia, and Massachusetts.

**3.** Amended Complaint, Ex. B.

EVA to more directly incorporate the North American assets into the family partnership. The plaintiffs allege that on April 14, 2006, the majority of the partners of EVA passed a resolution at a meeting in Germany that directed Ulrike to account for any and all bank accounts holding funds of EVA that were under her control in North America. The resolution further instructed Ulrike to transfer those assets into an account in the name of EVA. Ulrike, however, refused to take those actions because it is her opinion that many of the assets that the plaintiffs claim are owned by EVA are actually owned by the family members individually because that is how those assets are legally titled.

On May 23 and May 24, 2006, the partners of EVA held a meeting in Cologne, Germany. At that meeting, Ulrike's failure to account for or transfer the assets was discussed. Following that discussion, the plaintiffs claim that Ulrike's attorney promised to provide the information within two weeks. Also at that meeting, two more specific resolutions were allegedly adopted by the majority of the EVA partners. The first required Ulrike to transfer approximately CAD $1 million from Canada back to Germany, and the second instructed Ulrike to cease investment in the El Banco Vineyards business in California. Allegedly, Ulrike complied with neither.

As a result of these acts, the plaintiffs filed suit against Ulrike in Canada on September 21, 2006. In the "Canadian Action," the plaintiffs assert that the individual family members' interests in Maare Holdings Ltd., a Canadian entity, were purchased with funds belonging to EVA, and therefore equitably owned by EVA. On October 3, 2006, Ulrike filed a counterclaim seeking a declaration that her shares in Maare, which were titled in her name only, were free of any claims, encumbrances, or equitable obligations to EVA or her siblings.

A week after filing her counterclaim in the Canadian Action, Ulrike filed suit in Germany. Ulrike's first suit, or *Klage*, sought an accounting by EVA for its 2005 performance under the terms of the EVA Partnership Agreement as well as relief based on alleged mismanagement of funds. That lawsuit was filed on October 10, 2006 in Landgericht Trier, which is the court of appropriate jurisdiction for Gerolstein, Germany, and seems on its face to comport with a provision in the Partnership Agreement, which has been translated by Ulrike to read: "Venue of jurisdiction and place of performance for all obligations resulting from this agreement is Gerolstein."[4]

The first "German Action" was followed by a second filed on November 23, 2006 in the same court. Like the first, the second *Klage* sought various remedies under the EVA Partnership Agreement and principles of German law. The crux of this action was an interest-swap transaction that Ulrike claimed was related to EVA, but that her other siblings said was not. As such, the ownership interests of EVA were again implicated.

In between the filing of the first and second German Actions, the plaintiffs filed suit in California—the third jurisdiction to consider a dispute relating to EVA. The "California Action" commenced on November 16, 2006. The complaint in that case alleged that EVA was entitled to a portion of the proceeds from the sale of a real estate investment in California owned through the Office Building Crescent Heights Ltd. partnership. Again, EVA's position was that it, rather than simply the owners identified in the titling documents, was an owner of the real estate invest-

---

4. Amended Complaint, Ex. A at § 17.

ment. On December 22, 2006, Ulrike was joined as an intervenor in this Action. As in each of the other forums, Ulrike took the contrary position that she and each of the other Diedenhofen family members were individually the owners of the assets in question and that EVA did not have any legal or equitable claim to those assets or their proceeds.

On December 1, 2006, the plaintiffs allegedly executed and delivered to Ulrike a "Termination of Authority." Pursuant to that document, any implied or agreed trustee relationship between her and EVA was purportedly terminated. Moreover, her authority to act with respect to any and all of the EVA assets was revoked. The individual plaintiffs likewise withdrew their consents and authorizations allowing Ulrike to act on their behalves.

Finally, on December 4, 2006, over two months after the plaintiffs' first lawsuit was filed, this "Delaware Action" was filed. Here, the plaintiffs assert claims that are substantively identical to the breach of fiduciary duty and breach of contract claims that they put forth in the California and Canadian Actions. The only difference is that in the Delaware Action the plaintiffs purport to address all the North American assets Ulrike has administered for family members, regardless of location.

After this case was filed, Ulrike filed a third German Action, again in the courts encompassing Gerolstein. The third *Klage* was filed on June 11, 2007 and incorporated the claims already pending in California and Canada—i.e., that the assets in question in those cases are not owned by EVA. Ulrike did not implicate the full range of North American assets that have been put at issue in the Delaware Action in her

third *Klage*. Through counsel, though, she has represented that she would subject herself to full jurisdiction as if she were a resident in Germany in that action and that she will comply with all applicable discovery rules.[5]

Over the months since these actions were first filed, many events have transpired. With regard to the German Actions, judgment was entered in favor of Ulrike on May 15, 2007 in the first *Klage,* holding that an accounting was required under the EVA Partnership Agreement for the year 2005. The second *Klage,* which had requested an accounting for an interest swap transaction, was dismissed on May 23, 2007. In granting dismissal, the court determined that the defendants were improper because the EVA Partnership Agreement did not cover the swap transaction because it was conducted by non-EVA Diedenhofen family entities.

Regarding the cases in California and Canada, those actions have expanded to encompass a similarly large range of claims. For example, in the California Action, deposition questioning during discovery addressed numerous non-California assets allegedly owned by EVA as well as the obligations owed by Ulrike under the Trust Agreement. Upon objection by Ulrike's counsel, opposing counsel represented that these issues were relevant to the California Action regarding the pattern and custom of the parties. The Canadian Action also ballooned. New claims were added to the complaint, and EVA was added as a party in May 2007. As a result, the plaintiffs (in both this case and the Canadian Action) conceded that resolution of the issues in the Canadian Action

5. Transcript of Oral Argument on Defendant's Motion to Dismiss (June 20, 2007) ("O/A Tr.") at 12–13 (representing that Ulrike "would be willing to ... respond to discovery, whatever

is available in the German court typically against a German resident, without the need to go through the letters rogatory process").

would likely have an impact on all of the proceedings around the world.

### III. *Legal Analysis*

■ Ulrike has based her motion to dismiss or stay on several arguments. I concentrate my analysis only on her argument under the doctrine established by *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Engineering Co.*[6] and its progeny. I find Ulrike's arguments under *McWane* to be persuasive and grant her motion to stay on that basis.

The well-known *McWane* opinion states: [A] Delaware action will not be stayed as a matter of right by reason of a prior action pending in another jurisdiction involving the same parties and the same issues; that such stay may be warranted, however, by facts and circumstances sufficient to move the discretion of the Court; that such *discretion should be exercised freely in favor of the stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues;* that, as a general rule, litigation should be confined to the forum in which it is first commenced, and a defendant should not be permitted to defeat the plaintiff's choice of forum in a pending suit by commencing litigation involving the same cause of action in another jurisdiction of its own choosing; that these concepts are impelled by considerations of comity and the necessities of an orderly and efficient administration of justice.[7]

■ Under this test, Ulrike argues that the Canadian, German, and California Actions all constitute prior-pending actions involving substantially the same parties and the same issues in courts capable of doing prompt and complete justice. The two key issues are whether the parties and claims in this case are substantially similar to those raised in any of the cases that were filed earlier.[8] The captions need not be exact replicas, nor must the counts in each complaint be identical. What is important is that the same individuals or entities be involved in each of the disputes and that the issues raised in each case arise out of a common nucleus of operative facts.[9]

Both of those tests are met here. All of the pending actions involve the members of the Diedenhofen family and their partnership, EVA. Although other entities and individuals who have become involved in this family and partnership dispute are also named in the Actions based on their relationship to certain transactions, the same key players in Delaware are already gathered together in California, Canada, and Germany. Likewise, each of the Actions presents substantively the same claims and defenses that have been raised in this court. All are, in essence, lawsuits concerning the ownership status of certain assets in which the partners of EVA have an alleged interest of some sort. More specifically, all the disputes have a common question: did the Diedenhofen family intend the assets it acquired to be held for

---

6. 263 A.2d 281 (Del.1970).

7. *Id.* at 283 (emphasis added); *see also Chadwick v. Metro Corp.*, 856 A.2d 1066 (Table), 2004 WL 1874652, at *2 (Del.2004) ("Under *McWane* and its progeny, a judge, in the exercise of his or her discretion, may stay or dismiss a later-filed suit where a first-filed suit is pending in a court capable of administering prompt and complete justice, and involves substantially similar parties and issues.").

8. *See Kurtin v. KRE, LLC*, 2005 WL 1200188, at *4 (Del.Ch.2005) (requiring a showing of "substantial or functional identity of the parties and issues") (internal quotations omitted).

9. *Id.*

EVA's benefit or did the family intend for ownership to be as reflected in the title documents? That matter does not require four courts to plumb its depths simultaneously.[10]

To avoid the consequence of these findings, the plaintiffs attempt to distinguish the Delaware Action as more comprehensive than any of the other Actions in its substantive scope, but more limited in its selection of parties. For example, the plaintiffs say that substantial identity of parties and issues is not present because the Canadian and California Actions name some of the alleged subsidiaries of EVA and other individuals related to those companies who are not implicated in the fiduciary conduct raised in Delaware and not named as parties to the Delaware Action. The plaintiffs also state that they chose not to raise all their claims against Ulrike relating to EVA's supposed North American assets in either California or Canada, preferring to use those actions as targeted ones addressing particular assets, and to use this last-filed Delaware Action as their omnibus North American litigation venture.

But precise identity of the parties and the issue is not required by *McWane*.[11] In the Canada Action, for example, all of the plaintiffs and Ulrike are parties. That substantial identity is more than sufficient. Moreover, the voluntary choice of the plaintiffs in the Canadian Action not to pursue broader relief against Ulrike there

does not aid them. The plaintiffs' penchant for claim-splitting does not substitute for a demonstrated attempt to press all their related claims against Ulrike in their earlier-chosen forums.[12] The gravamen of the plaintiffs' theories in California and Canada is identical to that underlying their claims here, which is that EVA, and not the individual parties who hold paper title, is the actual owner of assets in North America. The plaintiffs have not convinced me that they could not address all their claims in one of their prior pending actions; in fact, given their argument that Ulrike acted for EVA in both California and Canada and the related nature of their arguments, it is by no means obvious that Ulrike would have any substantial grounds to object to having all the claims against her heard in one of those cases.

As important are the prior-pending German Actions that were filed by Ulrike before the Delaware Action. In her first German Action, Ulrike sought an accounting from EVA. The naturally-responsive arguments that the plaintiffs should have raised in the German Action were that it was Ulrike herself who needed to account to EVA for her use of its North American assets, and that she had improperly diverted EVA assets to her own personal use. In the German Action, Ulrike was before the court, and so were the plaintiffs and EVA. That Action was pending in the courts of Trier, the very German jurisdiction in which all of the plaintiffs reside,

---

10. *See Davis Int'l, LLC v. New Start Group Corp.*, 2005 WL 2899683, at *4 (Del.Ch.2005) ("It would be a wasteful duplication of time, effort, and expense if the court ... allowed parallel adjudications to proceed simultaneously.").

11. *E.g., Kurtin*, 2005 WL 1200188, at *4.

12. *E.g., Cornerstone Technologies, LLC v. Conrad*, 2003 WL 1787959, at *14 & n. 56 (Del. Ch.2003) (explaining that Delaware courts

"frown on claim splitting" and holding that "[w]hatever the motivation, proper or improper, this court need not indulge the plaintiffs' whim for simultaneous conflict in two different forums of its own choosing"); *see also Corwin v. Silverman*, 1999 WL 499456, at *5 (Del.Ch.1999) ("[N]either equity nor fairness is served by allowing plaintiffs' counsel to repudiate [a] jurisdiction in which they have deliberately chosen to litigate ....") (internal quotations omitted).

and the place that the forum selection clause of the Partnership Agreement specifically identified as a venue for resolving disputes.[13]

By raising their arguments in that forum, the plaintiffs would have had their chance to make German law arguments through German lawyers and through witness testimony and written evidence in German addressed to a German judge. This would seem to be particularly fitting given that the partners in EVA, a German partnership, communicated orally and in writing in German, and held meetings of the partners in Germany. What could be better than to have a judge steeped in the relevant law and learned in the pertinent language hear from all the parties in the language of their common dealing and reach a reasoned decision about the facts and their legal consequences? Instead of taking advantage of the opportunity for such a decision, the plaintiffs chose to sue Ulrike in a fourth forum, here in Delaware.

■■■■ Candidly, what seems to have motivated the plaintiffs is their desire for American-style discovery. They seek to bypass limitations they perceive in their own nation's approach to litigation, and obtain the fulsome [14] discovery available in the United States. But that is no basis to deny Ulrike's motion under *McWane*. EVA is a German partnership governed by German law. The Partnership Agreement clearly foresees the possibility of litigation in Germany regarding the partnership. The fact that in the German system the court has a stronger hand in directing evidence-gathering and submission does not mean that a court in Germany cannot do complete justice within the *McWane* sense. To conclude otherwise in a case that has at its core questions of German business law and affecting a German partnership would be xenophobic and disrespectful. In that vein, I note that our own corporation law does not provide stockholders with an unlimited right to books and records,[15] nor do this court's procedural rules provide an unlimited right to discovery.[16] Notably, Congress has adopted legislation in recent years greatly restricting discovery in securities class actions.[17]

13. I do not reach a decision on Ulrike's argument that the forum selection clause, which provides that venue for disputes resulting from the Partnership agreement *"ist Gerolstein,"* vests the German courts with exclusive jurisdiction. The exclusivity questions turns on the meaning of the contractual language of the Partnership Agreement, which was drafted in German and appears in a context in which an understanding of German law and custom is required to ascertain its proper meaning. That presents exactly the sort of issue that would infest the entirety of this litigation were it to continue here. This court would, quite literally, be put in the position of determining what the meaning of every *"ist"* is—a prospect that is wholly unmanageable given the reality that virtually every piece of evidence submitted would be in German. Fortunately, at this stage, it is sufficient to note that regardless of whether the affirmative and blunt *"ist"* establishes an exclusive jurisdiction or merely suggests Gerolstein as one approved by the parties, the forum selection clause illustrates that proceedings in Germany were expressly contemplated by the parties.

14. A word that has more than one pertinent sense when used in reference to pre-trial discovery.

15. *E.g.,* 8 Del. C. § 220; *Highland Select Equity Fund, L.P. v. Motient Corp.,* 906 A.2d 156 (Del.Ch.2006) (emphasizing the limited nature of the right to books and records under § 220), *aff'd,* 922 A.2d 415 (Del.2007).

16. *E.g.,* COURT OF CHANCERY RULE 26(b)-(c); *Norman v. Paco Pharmaceutical Services, Inc.,* 1991 WL 182447, at *1 (Del.Ch.1991) (applying Rule 26 and stating, "Discovery is not ... unlimited.")

17. *See* 15 U.S.C. § 78u–4 (Private Securities Litigation Reform Act of 1995).

Furthermore, the mere fact that the plaintiffs proceeded in Germany would not deny them the right to receive assistance from American courts in obtaining discovery in the United States. A federal statute exists precisely for that purpose.[18] In fact, such requests are now met with a warmer reception than they have ever before enjoyed.[19]

■ As discussed, judgments were entered in Ulrike's first and second German Actions shortly before the oral argument on this motion, and her third *Klage* was not filed until after this litigation had commenced. That reality does not, however, aid the plaintiffs. Ulrike filed her motion to stay while the first two *Klages* were still pending and put the plaintiffs on notice that they should proceed in one of the previously implicated forums. Ulrike has now filed an additional action in Germany with additional claims and appears to seek to have adjudicated in Germany the plaintiffs' claims pending in California and Canada. This is an admittedly confusing development but I do not believe it changes the appropriate outcome.[20] It remains indisputably clear that the German forum has been continually in use since the time this Action was filed. The plaintiffs' preference for forum multiplication should not be rewarded. If, as they should have, the plaintiffs had brought their claims in the prior-pending German Action, those claims would be pending (or perhaps resolved) there now.

Moreover, if the plaintiffs did not want to bring their claims in Germany, they should have tried to broaden their action in either Canada or California, instead of opening up yet another forum. Ulrike's recent confusing action will not be rewarded by this court, of that the plaintiffs should and will be assured. But it does support her motion for a stay in an odd way because it highlights the inefficiency of having a fourth court involve itself in resolving a relatively discrete dispute among the members of a family partnership in Germany. Oddly, having a forum dispute simply over whether this family dispute should be heard in Germany or Canada would in fact be a modest improvement over the current situation.

Put simply, there is no rational justification for allowing this action to proceed in the face of prior pending litigation in Germany, Canada, and California. Obviously, the forum best equipped to handle this dispute is in Germany and one would hope that rational parties at odds with one another would at least be able to agree on having their dispute resolved in the court that has the best chance of efficiently, expertly, and accurately rendering a decision. But this court is also no better

---

18. *See* 28 U.S.C. § 1782 (2007) (authorizing federal courts to order production of documentary or testimonial evidence for use in a proceeding before a foreign tribunal).

19. *E.g., Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004) (refusing to place "categorical limitations" on § 1782's reach and rejecting the necessity for showing that domestic laws would permit discovery in analogous litigation); *In re Gemeinshcaftspraxis Dr. Med. Schottdorf,* 2006 WL 3844464 (S.D.N.Y. 2006) (granting broad discovery to a German partnership under § 1782).

20. Ulrike is not the only one who has been a tad inconsistent. Although the plaintiffs here claim that this court can do as good a job as a German court, they retreated behind the language barrier in the Canadian Action, arguing that certain written statements "cannot be clearly interpreted" from German to English, and that double negatives in cross examination questioning were difficult to translate into German. *See, e.g.,* Defendant's Opening Brief (Jan. 18, 2007), Ex. 21 at 67, 100 (cross examination of Gotz Diedenhofen).

positioned than the courts of Canada or California to adjudicate this dispute. Simply because one of the parties has a home here has little bearing on the overall adjudication of the case. Whether the dispute proceeds here or in Canada or California, almost every witness will be from somewhere else. The key documents will be in a language the court does not understand. The court will have to make witness credibility determinations based on translated testimony. The court will have to make determinations of German law based on expert testimony and translated documents. The Canadian and California courts are as well positioned as this court to hold such a burdensome and time-consuming trial and to render a ruling that will necessarily involve a greater than typical risk of legal and factual error.

Therefore, under *McWane*, this litigation should be stayed and the parties remitted to decide their dispute in one of the forums in which prior pending litigation among them existed. Those three forums can work out which gets the prize.

■ This conclusion is also bolstered by an assessment of the practical realities of this case. Consideration of such issues is relevant to the court's "inherent discretion to control its own docket, subject only to statutory and rule constraints and the requirement to exercise its discretion rationally."[21] To that end, the court may countenance notions of comity and efficient administration of justice.[22] For reasons already explained, the practical reality is that litigating under these circumstances in Delaware would be redundant, unnecessary, and wasteful.

■ Much of that unduly heavy burden would be borne by the citizens of this State.[23] But this State has no important interest at stake in this litigation. That Ulrike lives here is a minor consideration, given that she can be held accountable for her responsibilities to her partners in a German partnership in prior pending actions. Moreover, the plaintiffs face no cognizable prejudice by being required to press their claims in one of the previously implicated forums. As this court has explained, when a "plaintiff is a foreign citizen and is not suing in his or her home forum the presumption as to plaintiff's convenience in litigating in this forum is less reasonable, and thus the choice merits less deference."[24] This is particularly so when an alternative is litigating in the plaintiffs' home nation (i.e., Germany), as that has been regarded as imposing a manageable burden on the plaintiffs.[25]

That said, the plaintiffs should not face any gamesmanship from Ulrike. Ulrike has expressly asked this court to stay this action under *McWane* in favor of the liti-

---

**21.** *Brudno v. Wise*, 2003 WL 1874750, at *4 (Del.Ch.2003).

**22.** *Id.; see also Schnell v. Porta Systems Corp.*, 1994 WL 148276, at *3 (Del.Ch.1994).

**23.** *See Sumner Sports, Inc. v. Remington Arms Co., Inc.*, 1993 WL 67202, at *6 (Del.Ch.1993) (explaining that the combination of applying foreign law with the added inconvenience and expense of dealing with translated evidence would burden the courts of Delaware and weighed in favor staying the Delaware litigation).

**24.** *Miller v. Phillips Petroleum Company Norway*, 529 A.2d 263, 270 (Del.Super.1987), aff'd, 537 A.2d 190 (Del.1988); *see also Lony v. E.I. duPont de Nemours & Co.*, 886 F.2d 628, 634 (3d Cir.1989) ("[T]he reason for giving a foreign plaintiff's choice less deference is not xenophobia, but merely a reluctance to assume that the choice is a convenient one.").

**25.** *See Sumner*, 1993 WL 67202, at *6 (recognizing that it is "unlikely that plaintiff[s] will be unduly burdened if [they] are required to litigate in the court of [their] domicile, principal place of business, and nationality").

gation filed in California, Canada, and Germany. In particular, Ulrike has stressed the Canada and German forums as ones to which deference should be accorded. Therefore, I expect that she shall submit to the personal jurisdiction of each of those courts, and accept their determinations as to where the plaintiffs' claims should proceed. That condition shall be contained in the order I enter. By that means, the plaintiffs will be assured that Ulrike has not won any unfair delay by having this court defer to previously filed litigation, only then to claim she cannot be sued in those forums.

Once the litigation in the other forums has been concluded, the plaintiffs can seek to lift the stay if there is some purpose for further proceedings here. The parties shall file a status report twice a year beginning January 15 to ensure that this action does not remain pending unless there is a necessity for that.

\* \* \*

I need not and do not premise my ruling on forum non conveniens grounds. But Ulrike remains free to reiterate her forum non conveniens argument in the event that the plaintiffs move to lift the stay. If that argument has to be taken up in the future, an important issue of public policy will be at stake. The Delaware courts have long asserted that this state has a compelling interest in the efficient and consistent application of its laws governing business entities. For that reason, our courts have been far less willing to defer to tribunals in other states when unsettled issues of Delaware law are at stake.[26] These rulings have recognized the reality that it is often judicial decisions that give practitioners the practical guidance they need about how much discretion their clients have to act. Those rulings also suggest that Delaware has a related and equally important interest in affording comity to the courts of other jurisdictions when a dispute arises under foreign business law.[27] When a con-

26. *See, e.g., Sternberg v. O'Neil,* 550 A.2d 1105, 1124–25 (Del.1988) ("The Delaware courts and legislature have long recognized a 'need for consistency and certainty in the interpretation and application of Delaware corporation law and the desirability of providing a definite forum in which shareholders can challenge the actions of corporate management without having to overcome certain procedural barriers which can be particularly onerous in the context of derivative litigation.'") (quoting *Armstrong v. Pomerance,* 423 A.2d 174, 178 (Del.1980)); *In re Topps Co. S'holders Litig.,* 924 A.2d 951, 964 (Del.Ch. 2007) ("Delaware courts are better positioned to provide a reliable answer about Delaware corporate law in emerging areas.... That is especially so because appeals from this court go directly to the Delaware Supreme Court, the definitive authority on our common law of corporations, which regulates much of the internal affairs of Delaware corporations."); *Ryan v. Gifford,* 918 A.2d 341, 349–50 (Del. Ch.2007) ("Delaware courts have a 'significant and substantial interest in overseeing the conduct of those owing fiduciary duties to shareholders of Delaware corporations.' This interest increases greatly in actions addressing novel issues.") (quoting *In re Chambers Dev. Co. S'holders Litig.,* 1993 WL 179335, at \*8 (Del.Ch.1993)); *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* 1985 WL 21129, at \*2 (Del.Ch.1985) ("[N]ovel and substantial issues of Delaware corporate law ... are best resolved in a Delaware court.").

27. *E.g., Topps,* 924 A.2d at 962 & n. 41 (collecting cases indicating this court's willingness to defer to the primacy of other states' interests in the evolution and enforcement of their laws); *IM2 Merchandising and Manufacturing, Inc. v. Tirex Corp.,* 2000 WL 1664168, at \*10–11 (Del.Ch.2000) (deferring to Canadian courts on issues of intricate Canadian law); *but see Berger v. Intelident Solutions, Inc.,* 906 A.2d 134 (Del.2006) (reversing the decision of this court dismissing an action involving novel issues of Florida law upon finding that no "overwhelming hardship" was created by the necessity for interpreting Florida's law even though stockholders chose to be governed by Florida law by buying stock in a

stituent of a foreign business entity wishes to have a dispute involving that entity's internal affairs decided by a judge from the entity's domicile, who is expert in its law, and who speaks the language used by the entity's constituents, one would think that a Delaware court would be particularly sensitive to the legitimacy of that request. If we expect that other sovereigns will respect our state's overriding interest in the interpretation and enforcement of our entity laws, we must show reciprocal respect. In particular, that means giving more respect to the shared expectations of the owners and managers of a business entity that their internal affairs should governed by expert determinations made by jurists in the domicile of the entity, and much less to the desires of a plaintiff who for tactical reasons seeks to have a Delaware judge make a determination of foreign law. Much more is that so, one would think, when the Delaware court would be unable to even read the key legal and business documents in their language of origin, or hear from the witnesses in that language. *Lost in Translation* is not just a great movie; it's also an undeniable reality. Such an approach to dispute resolution risks undermining the certainty of application that business entities depend upon, and should, in my view, be given

extremely heavy weight in a rational forum non conveniens analysis.

### IV. *Conclusion*

For the foregoing reasons, Ulrike's motion to stay is GRANTED. The parties shall bear their own costs.[28] Counsel shall craft and submit within 10 days a conforming order.

---

Florida corporation, in the same way that Delaware stockholders elect Delaware's laws by purchasing the shares of corporations incorporated here).

28. Ulrike argues that the sentence following the forum selection clause in § 17 of the Partnership Agreement justifies an award of costs. As translated, that line reads: "All costs tied to this agreement are borne by the partnership." Amended Complaint, Ex. A at § 17. The plaintiffs' counsel failed to respond at all to this request in briefing. At oral argument, their counsel admitted that the plain language of the translation supported Ulrike's request but complained that the provision might not be given its English plain reading in the German legal context and that

Ulrike had not submitted expert legal testimony on that point. O/A Tr. at 59–60, 67. I am uncomfortable hoisting the plaintiffs on their own petards, and I will not. I am not persuaded by the literal translation that the contractual language was intended to apply here and I will not penalize the plaintiffs for their inexplicable failure to make argument in their brief. I do note, however, that the plaintiffs' belated argument on this point—that what seems plain in English might have a different meaning in the German language and law contexts and that expert evidence on such points is necessary for the court to render just decisions—cuts heavily against their own claim that this court is well-positioned to accurately and efficiently decide this family dispute.