**TA INSTRUMENTS–WATERS, LLC, Plaintiff,**

v.

**UNIVERSITY OF CONNECTICUT, Defendant.**

**C.A. No. 6985–VCL.**

Court of Chancery of Delaware.

Submitted: Nov. 4, 2011.
Decided: Nov. 8, 2011.

Richard R. Wier, Jr., Michele D. Allen, Wier & Allen, P.A., Wilmington, Delaware; Attorneys for Plaintiff.

Ralph E. Urban, Office of the Attorney General for the State of Connecticut, Storrs, Connecticut; Attorneys for Defendant.

### MEMORANDUM OPINION

LASTER, Vice Chancellor.

Plaintiff TA Instruments–Waters, LLC ("TA") has moved for an expedited hearing on an application for a preliminary injunction that would block the University of Connecticut from proceeding any further with a request for proposal. TA contends that the University is soliciting proposals in violation of (i) fair bidding requirements imposed by Connecticut law and (ii) the University's purchasing regulations. I deny the motion. Under the circumstances of this case, comity dictates that a Connecticut court should have the first opportunity to consider a matter of paramount importance to that state.

### I. FACTUAL BACKGROUND

The facts are drawn from TA's verified complaint and publicly available information. I have assumed the well-pled allega-

tions of the complaint to be true and given TA the benefit of all reasonable inferences.

## A. The Bidding Requirements That Govern The University

The University of Connecticut is "[t]he state's flagship institution of higher education." *http://www.uconn.edu/administration.php* (last visited November 7, 2011). The Connecticut General Assembly established the school by legislative act on April 21, 1881. After operating for decades under other monikers, it was rechristened in 1939 as the University of Connecticut. Today, the University system includes ten schools and colleges at its Storrs campus, separate schools of law and social work in Hartford, five regional campuses throughout the state, and schools of medicine and dental medicine at the UConn Health Center in Farmington.

Not surprisingly, the internal governance of the University is regulated extensively by Connecticut state law. The Constitution of the State of Connecticut provides that

> [t]he state shall maintain a system of higher education, including The University of Connecticut, which shall be dedicated to excellence in higher education. The general assembly shall determine the size, number, terms and method of appointment of the governing boards of The University of Connecticut and of such constituent units or coordinating bodies in the system as from time to time may be established.

Conn. Const. art. VIII, § 2. The Governor of Connecticut and the State Commissioners of Agriculture and Education serve as *ex officio* members of the Board of Trustees, and the Governor appoints another twelve of the Board's twenty-one members. *See* University of Connecticut, Board of Trustees, *http://boardoftrustees.uconn.edu/* (last visited November 7, 2011); *see also* Bylaws of the University of Connecticut, art. II.A, *available at* http://www.policy.uconn.edu/2011-03-23-By-Laws-Revised.pdf ("The corporate authority of the University of Connecticut is vested in a Board of Trustees."). Literally hundreds of sections in the Connecticut General Statutes address the University by name.

Under Connecticut law, "the chief executive officer of a state university ... is authorized to purchase supplies, materials, equipment, contractual services ..., execute personal service agreements ..., lease personal property ..., and undertake printing, publishing and microfilming for such ... institution." Conn. Gen.Stat. § 4a-52a(a). According to the plaintiff, when making purchasing decisions, the University must comply with the following statutory requirement:

> (a) All purchases of, and contracts for, supplies, materials, equipment and contractual services ... shall be based, when possible, on competitive bids or competitive negotiation. The [University] shall solicit competitive bids or proposals by providing notice of the planned purchase in a form and manner that the commissioner determines will maximize public participation in the competitive bidding or competitive negotiation process, including participation by small contractors ... and promote competition.... Each bid and proposal shall be kept sealed or secured until opened publicly at the time stated in the notice soliciting such bid or proposal.

Conn. Gen.Stat. § 4a-57(a). "'Competitive bidding' means the submission of prices by persons, firms or corporations competing for a contract to provide supplies, materials, equipment or contractual services, under a procedure in which the contracting authority does not negotiate prices...." Conn. Gen.Stat. § 4a-50(4).

In addition, according to the plaintiff, the University has internal procedures designed to ensure the fairness of the procurement process. "University of Connecticut Procedure 7.16 states that '[p]urchases exceeding the formal competition limit of $50,000 ... will be determined by competitive bids. A formal sealed solicitation process will be used as the standard for large purchases and contracts executed by the Purchasing Department whenever possible.'" Compl. ¶ 59. The solicitation must identify the product specifications and general terms and conditions. Solicitations must be publicly advertised, then publicly opened and read after the solicitation has closed.

## B. The Asphalt Rodeo

In November 2010, the University invited vendors of dynamic shear rheometers ("DSRs")—devices used to measure the viscous and elastic behavior of asphalt binders at medium to high temperatures— to demonstrate their products on February 8–9, 2011. This gathering was formally denominated the "Demonstration and Purchase of PG Binder Testing Equipment, Northeast States Pooled Fund TPF– 5(236)." Informally, it was known as "the Asphalt Rodeo."

The purpose of the Asphalt Rodeo was to select a DSR vendor whose product would be tested at the University's Advanced Pavement Laboratory for compliance with standards established by the American Association of State Highway and Transportation Officials. Representatives of state transportation agencies attended and evaluated the vendor presentations. Each participating vendor had to submit a formal proposal with its best and final pricing by 11:30 a.m. on February 8. It was expected that the winning vendor would receive a contract for twelve DSRs valued at approximately $500,000.

TA is a DSR vendor headquartered in Delaware. TA participated in the Asphalt Rodeo and submitted a formal proposal with its best and final pricing before the deadline. Other DSR vendors, including Malvern Instruments ("Malvern"), also participated. TA alleges that different vendors were treated differently, and that TA was not given the opportunity to demonstrate its DSR product to each agency representative. Malvern allegedly received this opportunity.

According to the complaint, when University and agency representatives originally met behind closed doors to review the bids, TA was the lowest bidder at $47,000. Malvern's bid was $53,400. At this point, James Mahoney, the Executive Program Director for the University's Advanced Pavement Laboratory, allegedly communicated with Malvern to obtain a lower price. In an email sent at 4:04 p.m. on February 8, nearly five hours after the pricing deadline, a Malvern representative stated: "Attached is the pricing worksheet to get you started for evaluations. Please keep in mind that I'm still working on greater justifications for better pricing and will hope you give us a chance to make a final offer." Compl. ¶ 41. The next day, after all of the DSR presentations had concluded, Malvern sent Mahoney another email stating, "the attached has the pricing updated and includes the additional service visit." *Id.* ¶ 42. On February 10, after the Asphalt Rodeo ended, Mahoney emailed Malvern stating: "The price you gave me yesterday on the sheet of paper (which I made a copy of it [sic] for you) was $43,500 for the Kinexus unit. Your spreadsheet still has it at $45,000." *Id.* ¶ 43.

Malvern's Kinexus model was selected for testing. Before the contract could be awarded, the University determined that the procedures followed at the Asphalt

Rodeo did not comply with Connecticut's competitive bidding laws or the University's internal procurement requirements.

## C. The Request for Quotation

Having decided that it could not award the DSR contract based on the Asphalt Rodeo, the University issued Request for Quotation B013719–4 (the "RFQ"). According to TA, the RFQ impermissibly favored Malvern by specifically soliciting the purchase of twelve Kinexus model DSRs. TA formally objected to the RFQ as a sole source bid. The University cancelled the RFQ on April 18, 2011.

## D. The Request for Proposal

On June 8, 2011, the University issued Request for Proposal PL060811 (the "RFP"). TA immediately objected, arguing that the RFP could not result in an open and competitive bidding process unless Malvern was excluded because of the University's prior instances of favoritism. On July 26, the University denied TA's objection and represented that what occurred at the Asphalt Rodeo and in connection with the RFQ would not affect the outcome of the RFP. TA attempted to appeal the University's decision, but was told that an appeal could not be pursued until the contract was awarded. TA submitted a bid under protest.

## E. The November Demonstration

On October 26, 2011, at 10:43 a.m., TA received an invitation from the University to participate in a presentation/demonstration for the RFP on November 1 at 1:00 p.m. According to TA, a demonstration of this magnitude generally would require three to four weeks of preparation. TA received only four business days notice. TA regarded this as another example of an unfair procurement process.

## F. This Litigation

On October 26, 2011, TA filed this litigation. TA moved to expedite and sought a temporary restraining order barring the University from proceeding with the November 1 demonstration. The University temporarily mooted the TRO application by rescheduling the demonstration for November 18. TA pressed forward with its motion to expedite and requested a prompt hearing on a preliminary injunction to prevent the University from continuing with the RFP or awarding a contract for DSRs.

I heard argument on TA's motion to expedite on November 4. During the hearing, the Office of the Attorney General for the State of Connecticut raised a facially serious challenge to this Court's ability to exercise personal jurisdiction over the University. I ordered the parties to submit accelerated briefing on personal jurisdiction and otherwise took the motion to expedite under advisement.

## II. LEGAL ANALYSIS

■ TA's motion to expedite is denied as a matter of comity. "The United States is a federal republic that depends on comity among the states. . . ." *Third Ave. Trust v. MBIA Ins. Corp.*, 2009 WL 3465985, at *1 (Del.Ch. Oct. 28, 2009). "When a state court with little legitimate interest in a matter purports to speak on a subject of importance to a sister state, the reliability of state law is undermined and a counterproductive incentive is created for all state courts to afford less than ideal respect to each other." *Id.* The claims in this case implicate paramount interests of the State of Connecticut. Although Delaware has an interest in providing a forum for one of its citizens, Connecticut has the far greater interest in this dispute. Under the circumstances, it would not be appropriate for a Delaware court to preempt the ability of a Connecticut court to weigh in by

scheduling expedited proceedings culminating in a swift preliminary injunction hearing.

Multiple factors point to Connecticut's significant interest in this litigation. The law that governs the dispute provides an initial indication. *See Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1213 (Del.Ch. 2010) ("Choice of law … operates as a proxy for Delaware's interests, and the analysis must address the degree to which Delaware has a particular interest in the subject matter of the case."). In some cases, the law of several jurisdictions could apply, and determining which sovereign's law governs requires a multi-factor balancing test laden with discretionary assessments. *See* Restatement (Second) of Conflict of Laws § 6(2) (1971) (identifying seven factors for use in determining which law has the "most significant relationship" to the dispute). If the law of one jurisdiction is not clearly implicated, then the lack of an obvious answer reveals that no particular sovereign has the paramount interest in the dispute. Conversely, if the law of a particular jurisdiction necessarily controls, that answer in turn signals the primacy of that sovereign's interests.

Beyond the basic question of which law applies, the nature of the legal issues reveals their importance. Relevant considerations include the "novelty of questions of law to be answered, the desirability of providing a … forum [for a particular type of dispute], and the importance of overseeing the conduct of particular classes of actors and policing against particular types of wrongdoing." *Hamilton P'rs*, 11 A.3d at 1213.

In this case, every substantive issue will be governed by Connecticut law. No multi-factor balancing is required. The plaintiff has sued for violations of Connecticut statutes. All of the conduct in question took place in Connecticut. There is no other jurisdiction whose law conceivably could apply.

More importantly, the issues raised in the complaint have great significance to Connecticut. The University is an entity chartered under Connecticut law. The Connecticut General Assembly granted the University its juridical existence and established the legal framework for its operation. Connecticut therefore has a strong interest in overseeing the University's activities and the conduct of its representatives. As part of its oversight authority, the Connecticut General Assembly enacted fair bidding statutes that govern the University and other state institutions. Connecticut has a singular interest in policing against violations of these statutes. As the source of chartering and regulatory authority, Connecticut is uniquely positioned to provide a forum for adjudicating the claims asserted in the complaint.

Delaware cannot match Connecticut's interests. Although this case was brought by TA in its capacity as a potential supplier, the alleged misconduct did not only affect TA. It similarly affected all of the suppliers who participated in the Asphalt Rodeo, who sought to respond to the RFQ, and who would now participate in the RFP process. *See Lawrence Brunoli, Inc. v. Town of Branford*, 247 Conn. 407, 722 A.2d 271, 274 (1999) ("[R]ather than being an action to vindicate the personal harm the bidder perceives it has suffered, [an action to enforce the fair bidding laws] is brought in the public interest by one acting essentially as a 'private attorney general.'" (internal quotation marks omitted)). TA is a Delaware citizen, and Delaware undoubtedly has an interest in providing a forum in which its citizens can litigate. But there is no apparent reason why TA could not litigate equally well in Connecticut, and Delaware's interest in providing a forum for TA rises no higher than the parallel

interest of every other state that was home to a DSR supplier. Delaware has no grounds to regulate the internal affairs of a Connecticut entity or to oversee the conduct of University officials. As one of multiple jurisdictions with an interest in protecting its own citizens but no comparable interest in a Connecticut institution or violations of Connecticut law, Delaware should defer to Connecticut.

In this regard, the current litigation bears a strong conceptual resemblance to a stockholder class action for breach of fiduciary duty. Indeed, in a jurisdiction that recognized suppliers as a constituency to whom directors owed duties, one could envision a wronged supplier asserting some type of "fair treatment" claim. In essence, the complaint alleges that University personnel owed a duty under Connecticut law to engage in a fair bidding process when choosing suppliers. The complaint further alleges that University personnel breached this duty by engaging in back-channel discussions at the Asphalt Rodeo and then attempting a sole-source bid under the guise of the RFQ. Although the complaint might look at first blush like a bilateral contract dispute, it actually involves the internal affairs of a Connecticut entity and will determine whether the representatives of that entity complied with their statutory and regulatory duties.

Connecticut therefore has the greater interest in this dispute. There is also the basic fact that the Connecticut court system is better positioned to resolve this case. I can admit without shame that I have never before encountered litigation involving Connecticut's fair bidding laws or the University's internal procurement regulations. Before this case, I had never read the relevant portions of the Connecticut General Statutes. I do not have the Connecticut reporters on my shelves, and the Court of Chancery does not own any treatises on Connecticut law. I necessari-

ly lack the greater familiarity with Connecticut jurisprudence that a Connecticut judge will possess, and I cannot match the superior feel for considerations of Connecticut public policy that a Connecticut jurist will have. At best, I can hazard a prediction about how the Connecticut Supreme Court might rule. In litigation conducted in Connecticut, by contrast, the parties can obtain a definitive ruling on Connecticut law from the only tribunal empowered under the United States Constitution to provide it: the Connecticut Supreme Court.

Yet another reason for caution lies in the University's significant challenge to this Court's exercise of personal jurisdiction. During the hearing on the motion to expedite, the University represented that all of its contacts with TA took place through a TA office in Connecticut. According to the University, its only contacts with Delaware have involved purchases of products unrelated to the current causes of action. If these representations are borne out, it is far from clear that this Court can exercise jurisdiction over the University under Delaware's long-arm statute, 10 *Del. C.* § 3104, in a manner consistent with the United States Supreme Court's rulings on due process. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, —— U.S. ——, ——, 131 S.Ct. 2846, 2849, 180 L.Ed.2d 796 (2011); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). A Connecticut court would not face this impediment and could readily exercise jurisdiction.

To recognize that the Constitution State's courts can better resolve this dispute does not imply that the First State's courts play second fiddle. It simply recognizes the elementary concept of comparative advantage. In the context of this case, the Connecticut courts have comparative advantages that reinforce their

state's greater interest in the outcome of this litigation. In another case, these considerations might point in the opposite direction.

■ A trial court has "inherent power ... to control its own docket, manage its affairs, achieve the orderly disposition of its business and promote the efficient administration of justice." *Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1201 (Del. 1997). "To that end, the court may countenance notions of comity and efficient administration of justice." *Diedenhofen-Lennartz v. Diedenhofen*, 931 A.2d 439, 450 (Del.Ch.2007). In my view, this Court should not preemptively seize control of a dispute in which Connecticut has a far greater interest. I reach this conclusion even though there is no action currently on file in Connecticut. Depending on how the litigation evolves, the need for deference may diminish. If the University or another disappointed supplier does not promptly file in Connecticut, then this Court would have a freer hand to proceed, assuming, of course, that the University is subject to jurisdiction in Delaware. Likewise if an action is filed in Connecticut, but the Connecticut judge defers to this Court, then the dictates of comity will have been satisfied.

### III. CONCLUSION

The motion to expedite is denied out of respect for the superior interests of a sister state. The order requiring expedited briefing on personal jurisdiction is vacated, and this case will proceed on a non-expedited basis. The parties will notify the Court promptly of any action filed in Connecticut. TA may renew its application for expedited proceedings if circumstances warrant. **IT IS SO ORDERED.**