EFiled: Dec 22 2023 08:00AM EST
Transaction ID 71679732
Case No. 2023-0988-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SUNDER ENERGY, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 2023-0988-JTL |
| | ) |
| TYLER JACKSON, FREEDOM FOREVER | ) |
| LLC, BRETT BOUCHY, CHAD TOWNER, | ) |
| FREEDOM SOLAR PROS, LLC, and SOLAR | ) |
| PROS LLC, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION CERTIFYING INTERLOCUTORY APPEAL

Date Submitted: December 14, 2023
Date Decided: December 22, 2023

Raymond J. DiCamillo, Chad M. Shandler, Steven J. Fineman, Kelly E. Farnan, Kevin M. Gallagher, Christine D. Haynes, Alexander M. Krischik, Sara M. Metzler, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joshua Berman, Jackson Herndon, Paul C. Gross, Ben Nicholson, Michael H. Rover, PAUL HASTINGS LLP, New York, New York; *Attorneys for Plaintiff Sunder Energy, LLC.*

Timothy R. Dudderar, Aaron R. Sims, Abraham C. Schneider, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Maureen M. Stewart, FOLEY & LARDNER LLP, Tampa, Florida; Jordan C. Bledsoe, Tyler Dever, Bryce W. Talbot FOLEY & LARDNER LLP, Salt Lake City, Utah; *Attorneys for Defendant Tyler Jackson.*

Paul J. Lockwood, Jenness E. Parker, Jessica R. Kunz, Matthew R. Conrad, Eric M. Holleran, Mallory V. Phillips, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Karen Hoffman Lent, Evan R. Kreiner, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for Defendants Freedom Forever LLC, Brett Bouchy, Chad Towner, and Freedom Solar Pros, LLC.*

**LASTER, V.C.**

Sunder Energy, LLC ("Sunder") moved for a preliminary injunction to enforce restrictive covenants in its limited liability company agreement against Tyler Jackson. Sunder also sought a preliminary injunction against Freedom Forever LLC, Solar Pros LLC, Freedom Solar Pros LLC, Brett Bouchy, and Chad Towner (collectively, the "Freedom Defendants") on the theory that the Freedom Defendants tortiously interfered with the restrictions binding Jackson.

I issued an opinion denying Sunder's motion (the "Injunction Decision"). Although technically a denial of a preliminary injunction, that opinion ruled on key issues as a matter of law. It is more akin to a decision that dismissed the bulk of Sunder's claims.

Sunder has filed an application to certify the Injunction Decision for interlocutory appeal (the "Application" or "App."). Ordinarily, a ruling on a preliminary injunction is not suitable for interlocutory appeal. An opinion granting a motion to dismiss, by contrast, results in a final judgment that can be appealed immediately.

Without an appeal, this case will move forward with the rulings in the Injunction Decision operating as law of the case. The limited nature of the remaining issues will constrain the breadth of fact and expert discovery and the scope of the trial. Any post-trial factual findings and legal rulings will be restricted to the remaining issues, as will any remedy (if Sunder prevails). The case will unfold very differently than if Sunder could pursue the claims the Injunction Decision rejected.

After entry of a final judgment, Sunder can challenge all of the errors it thinks I made, including the rulings in the Injunction Decision. While I would like to think that I got the Injunction Decision right, I have enough humility and experience to understand that the legal disputes that this case presents involve issues where reasonable minds can disagree. That is why the case was filed in the first place, and why the parties are willing to spend large sums to litigate it. If the answers were clear, Sunder would not have sued, or the case would have settled.

Consequently, there is always risk that the Delaware Supreme Court will disagree with my rulings. And for purposes of this case, there is a substantial difference between learning the definitive answers on key legal issues now versus later. If the Delaware Supreme Court disagrees with my rulings at the end of the case, everyone has to go back to square one. The scope of the lawsuit will expand dramatically. A complete do-over will be required.

By contrast, if the Delaware Supreme Court hears an appeal now, then the parties and I can implement the high court's views. True, that means the justices would hear an appeal before a final judgment, but they are likely to hear an appeal on the same issues in any event, and if they hear the appeal now, then there is no risk that they will have to revisit those issues later. Their legal rulings will be binding.

This decision therefore grants the Application. Ultimately, only the Delaware Supreme Court can determine whether to entertain the interlocutory appeal. My recommendation, however, is to hear the appeal now rather than later.

## I.     FACTUAL BACKGROUND

The facts are drawn from the Injunction Decision and matters subject to judicial notice. In the interest of brevity, this decision provides only a summary of the underlying facts.

### A.     Sunder's Beginnings

Sunder is a solar sales dealer organized as a Delaware limited liability company. Sunder currently operates in at least forty-seven states.

Sunder's sole business involves securing agreements with residential customers to install solar systems for their homes. Once an agreement is signed, Sunder hands the job over to an installer. Until September 2023, Sunder acted as an exclusive dealer for Freedom, a leading installer led by Towner and Bouchy.

Seven sales leaders from a different solar sales dealer founded Sunder in 2019. The co-founders agreed on an equity split. Eric Nielsen and Max Britton were the most senior sales leaders and received 60%. The other five—including Jackson—were more junior and received 8% each. With that understanding, the co-founders formed Sunder as a Delaware LLC. They also executed a five-year exclusive dealer agreement with Freedom.

### B.     The LLC Agreement

In fall 2019, Nielsen and Britton engaged a law firm to draft a written LLC agreement for Sunder. The other co-founders were not involved in the process. The law firm was representing all of the co-founders in pending litigation brought by their former employer. All of the co-founders regarded the firm as their counsel.

3

When the draft was ready, Nielsen and Britton went to the law firm's offices and received a briefing about what the dense language of the lengthy draft agreement meant. The other co-founders were not invited, and no one explained the agreement to them.

The agreement dramatically changed the ownership structure of Sunder and radically altered its internal governance. Most significantly for this case, Article XIII added broad restrictive covenants.

Nielsen and Britton sprung the agreement on the minority members on New Year's Eve. Addressing the minority members as "Partners," Nielsen wrote:

> Max [Britton] and I have executed our portion of the Sunder Operating Agreement today and a copy for your review is attached. I will be sending each of you a couple of documents via docusign momentarily. The first one contains your grant of shares and the second one is a joinder agreement that will formally add each of you to the Operating Agreement. If you are married, your spouse will also be sent a spousal consent form. Please let Max or me know if you have any questions.
>
> Lastly, the attorney's [sic] highly recommend completing these documents by the end of tonight, but we don't expect any of you to sign something if you are uncomfortable with it or if you need more clarification from the attorney's [sic] on something. Please let me know if you have any questions.
>
> Happy New Year!

The New Year's email did not provide any indication that the agreement gutted the minority members' rights. The New Year's email did not suggest in any way that the minority members could not rely on Nielsen and Britton—their "Partners"—as fiduciaries. Nothing suggested that the minority members needed to go into adversarial, arms'-length bargaining mode and negotiate vigorously for themselves. All of the minority members quickly returned their signature pages.

4

Nielsen and Britton went further in 2021, when they proposed amendments to the agreement. That time, they did not even send a copy to the minority members. They simply circulated an email saying that the amendment would add a member and that there were no substantive changes. That was not true: The amendment expanded the geographic scope of the restrictive covenants, making them more onerous.

## C.     The Sunder-Freedom Relationship Blossoms, Then Deteriorates.

From 2019 until the start of 2023, Sunder thrived. Sunder grew into one of Freedom's "super-dealers," generating over 25% of its sales. Jackson's responsibilities at Sunder grew with the company. By 2022, Jackson had been given the title of Vice President and had nearly half of Sunder's sales force reporting to him directly or indirectly. He became the highest paid sales leader at Sunder, earning a total of $4.8 million in compensation over four years. Over the same period, he received a total of $1.2 million in profit distributions.

In 2021 and 2022, however, Nielsen and Britton made a series of business decisions that caused Sunder to encounter difficulties. Those decisions affected Sunder's relationship with Freedom and with its own sales force.

One issue was an effort to boost Sunder's profitability by artificially increasing the installation cost of the project over Freedom's quote then pocketing the difference. As a practical matter, the padded installation cost lowered the portion of the project price on which Sunder paid commissions and overrides, so it took money way from Sunder's sales force. Sunder's sales representatives eventually discovered that

5

Sunder had secretly changed its calculations. Not surprisingly, the revelation generated feelings of betrayal and distrust.

Another issue was whether Sunder would continue working with Freedom. The initial five-year dealer agreement would expire in 2024, and a new agreement would need to be negotiated. Freedom had been an essential part of Sunder's success, and its sales force knew Freedom's products and valued Freedom's industry-leading ability to install systems quickly. But another exclusive, multi-year deal with Freedom would limit Nielsen and Britton's alternatives. When asked about Sunder's future direction, Nielsen said that they prioritized working with Freedom, but they would not rule out the possibility that Sunder would go in a different direction.

## D. The Attraction Of Solar Pros

By early 2023, the combination of the artificial price floor and the uncertainty about whether Sunder would continue with Freedom were topics of discussion and debate among Sunder's sales force, and particularly its sales leadership. The sales leaders began questioning whether they should stay with Sunder or move to another Freedom dealer.

One attractive option was Solar Pros, a rapidly expanding dealer that was affiliated with Bouchy, one of Freedom's principals. Solar Pros did not have an artificial pricing floor and paid significantly higher commissions.

Jackson was one of the sales leaders who explored the possibility of moving to Solar Pros. Immediately after that meeting, Jackson asked Sunder's CFO for copies of all of the agreements he had signed with Sunder, evidencing that he was thinking about leaving.

6

After learning that he was bound by restrictive covenants, Jackson felt that his best option was to attempt to preserve the Sunder-Freedom relationship and keep his sales force together. He tried to facilitate meetings between Sunder and Freedom. He also tried to convince his sales leaders not to leave for Solar Pros. But he kept in touch with Solar Pros.

During the same period, Nielsen and Britton were keeping their options open regarding Sunder's relationship with Freedom. In June and July 2023, they began having meetings with other solar installers. In August 2023, they hired counsel to evaluate Sunder's rights under the dealer agreement with Freedom.

Sunder's sales leaders knew what Nielsen and Britton were doing, and they became even more concerned. In early September 2023, Clayton Granch decided to leave Sunder for Solar Pros and take his teams with him. Granch was one of Jackson's direct reports.

## E.    The Las Vegas Meeting

The principals of Sunder and Freedom met in Las Vegas on September 14, 2023. During the meeting, Freedom offered to pay $10 million in exchange for Sunder's agreement to release Jackson from his restrictive covenants and to facilitate the transfer of "his group" to Solar Pros. The parties did not reach an agreement, but they also did not seem that far apart.

After learning that the meeting went well, Jackson circulated a list of Sunder personnel to three of his direct reports. The list was an initial effort to identify who would join him at Solar Pros. Within days after the Las Vegas meeting, Jackson's

direct reports and their teams began leaving for Solar Pros. Jackson also worked hard to recruit members of his team to go to Solar Pros.

Sunder and Freedom did not reach a deal. Instead, on September 22, 2023, Jackson signed an independent consulting agreement with an affiliate of Freedom and Solar Pros. Four hours later, Jackson resigned from Sunder.

## F. This Litigation

On September 29, 2023, Sunder filed this action. Based on the detailed allegations in Sunder's verified pleading, I issued an *ex parte* temporary restraining order. That order was intended to preserve the status quo pending a hearing on whether to renew or lift the order, which would take place on or before October 18. On October 6, I issued an order to show cause interpreting the *ex parte* temporary restraining order in a manner favorable to Sunder.

The parties briefed whether the court should allow the TRO to expire or renew it. The defendants also moved to dismiss the case in favor of arbitration. On October 11, 2023, I renewed the TRO and denied the motion to dismiss.

Over the following month, the parties engaged in expedited discovery. A hearing on Sunder's motion for a preliminary injunction took place on Friday, November 17, 2023. On the following Wednesday, I issued the Injunction Decision.

## II. LEGAL ANALYSIS

Supreme Court Rule 42 governs the certification of an interlocutory appeal. "[T]he purpose of Rule 42 is to prevent wasteful piecemeal litigation from overwhelming the docket of the Supreme Court." *Stein v. Blankfein*, 2019 WL 3311227, at *1 (Del. Ch. July 23, 2019).

8

Rule 42 states that "[n]o interlocutory appeal will be certified by the trial court or accepted by this Court unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment." Supr. Ct. R. 42(b)(i). If the "substantial issue" requirement is met, then the trial court will analyze whether "there are substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal." Supr. Ct. R. 42(b)(ii). The rule identifies eight factors relevant to the assessment. Supr. Ct. R. 42(b)(iii)(A)–(H).

## A.   A Substantial Issue Of Material Importance

"The 'substantial issue' requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters." *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008); *accord Castaldo v. Pittsburgh–Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973). The Injunction Decision made legal rulings that meet the substantial issue requirement.

### 1.   The Validity Of The Restrictive Covenants Under Delaware Law

The Injunction Decision ruled that Sunder could not rely on the restrictive covenants because they were unreasonably broad as a matter of law. The Injunction Decision also refused to blue-pencil the restrictive covenants. Both rulings addressed substantial issues.

The Injunction Decision is an interlocutory ruling, but it is law of the case at the trial level. Based on those rulings, the defendants likely could move for summary judgment in their favor on those points. For those issues, the Injunction Decision is akin to the granting of a motion to dismiss.

9

Admittedly, the rulings on the restrictive covenants do not dispose of the case as a whole. The Injunction Decision acknowledged that Sunder likely could plead viable claims against Jackson based on his pre-resignation activities. Those remaining claims, however, would only cover a portion of the conduct that Sunder wants to challenge.

By ruling on those legal issues, the Injunction Decision decided the principal questions at issue in favor of the defendants. Those rulings meet the substantial issue requirement and, to that extent, are suitable for interlocutory review.

### 2. The Validity Of The Restrictive Covenants Under The LLC Act

The Injunction Decision held that Sunder could not rely on the restrictive covenants because they were invalid under the Delaware Limited Liability Company Act (the "LLC Act") and the common law governing fiduciary duties. That ruling addressed a substantial issue as well.

Like the rulings on the scope of the restrictive covenants, the fiduciary duty ruling is akin to a decision granting a motion to dismiss. By holding that the restrictive covenants could not be enforced, the Injunction Decision decided one of the principal questions at issue in favor of the defendants.

That ruling warrants interlocutory review even without Sunder's attempt to paint it as procedurally improper. Sunder trumpets that the court ruled on those issues "even though (i) it had not yet ruled on Jackson's Motion for Leave to assert these counterclaims and defenses and (ii) Sunder (and the Court) had learned of the fiduciary duty defense for the first time a few days prior to the hearing." App. ¶ 20 (footnote omitted). Jackson's motion for leave addressed whether he could assert

10

affirmative claims for breach of fiduciary duty. Whether that motion was granted did not affect Jackson's ability to raise the fiduciary duty issues as a defense. In expedited litigation, parties often raise arguments during injunction briefing that have not been fully spelled out in the pleadings. Ever since the Delaware courts adopted versions of the federal rules of civil procedure, pleadings have served a notice function. *See In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 375–76 (Del. Ch. 2023); *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *26, 36 (Del. Ch. May 19, 2020), *aff'd*, 263 A.3d 1013 (Del. 2021). A complaint is not a straitjacket. Jackson properly raised his fiduciary duty defense.

In a footnote, Sunder points out that I referred to Jackson's invocation of Nielsen and Britton's breaches of fiduciary duty "as an affirmative defense" and states that this characterization was "not correct at the time of the Decision." *Id.* ¶ 21 n.3. Jackson had raised an unclean hands defense in his answer, and unclean hands can be a vehicle for asserting a defense based on breach of fiduciary duty or fraud. *See, e.g.*, *Ray v. Williams*, 2020 WL 1542028, at *38 (Del. Ch. Mar. 31, 2020) (unclean hands based on fiduciary breach); *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 237 (Del. Ch. 2014) (unclean hands based on fraud). In any event, the asserted breach of fiduciary duty was a defense that Jackson had raised affirmatively and on which Jackson would bear the burden of proof.

The fact that Jackson had not formally spelled out a defense based on breach of fiduciary duty thus did not prevent him from arguing that the Nielsen and Britton's breach of duty rendered the restrictive covenants unenforceable such that Sunder

11

was not entitled to a preliminary injunction. Jackson had identified unclean hands as a defense in his answer, and he diligently pursued that defense by seeking discovery and moving to compel the production of documents related to that defense. *See* Dkt. 127. Jackson fairly presented the defense for purposes of the injunction application.

Jackson agrees that the validity of the restrictive covenants under the LLC Act presents a substantial issue but argues against interlocutory review because of the potential for further factual development. In support of that argument, he cites emails identified after the issuance of the Injunction Decision, which he says makes the fiduciary duty defense stronger. That may be so, but at least two issues of law can be addressed now. The first is whether Nielsen and Britton owed fiduciary duties to their fellow members in a member-managed LLC when asking them to approve the first written operating agreement for the entity, after having operated informally for months under a *de facto* operating agreement based on the LLC Act and oral understandings. The second is whether the New Year's email, standing alone, was sufficient to put the minority members on notice of their need to negotiate at arm's length. If Sunder prevails on either point, then the fiduciary defense fails.

The breach of fiduciary duty defense therefore presents a substantial issue. To that extent, it is suitable for interlocutory review.

### 3. The Tortious Interference Claim Under Utah Law

The Injunction Decision ruled that Utah law governed Sunder's tortious interference claim and that Sunder could not prevail against the Freedom Defendants

as a matter of law. In reaching that decision, the Injunction Decision decided a substantial issue suitable for interlocutory review.

Ordinarily, a choice-of-law ruling does not warrant interlocutory review. *E.g.*, *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 247 A.3d 688, 2021 WL 754850, at *1–2 (Del. Feb. 23, 2021) (ORDER). In this case, however, the choice-of-law ruling is dispositive because of the strictures of Utah law. Based on that ruling, the Freedom Defendants likely could move for summary judgment in their favor on Sunder's claims. The Injunction Decision effectively ruled on the merits of Sunder's claim against the Freedom Defendants, thereby addressing the merits of the case and making the issue appropriate for interlocutory review.

### 4. The Policy Issue Raised By Including Restrictive Covenants in Internal Governance Documents

Although Sunder has identified three substantial issues for appeal, an additional argument misses the mark. When discussing the Injunction Decision, Sunder points to a section in the introduction in which I described a multi-year trend involving parties' efforts to enforce restrictive covenants in the Delaware Court of Chancery (the "Policy Excerpt"). Reproduced in full, the Policy Excerpt stated:

> Sunder maintains that Jackson is bound by restrictive covenants. He received Incentive Units in Sunder, and the attorneys who drafted Sunder's LLC agreement embedded in its terms a set of restrictive covenants (the "Covenants") that bind any holder of Incentive Units. The Covenants consist of:
>
> - A restriction prohibiting the holder from engaging in any competitive activity (the "Competition Restriction");
>
> - A restriction prohibiting the holder from soliciting Sunder's employees and independent contractors (the "Personnel Restriction");

13

- A restriction prohibiting the holder from soliciting, selling to, accepting any business from, or engaging in any business relationship with any of Sunder's customers (the "Customer Restriction"); and

- A restriction prohibiting the holder from inducing, influencing, causing, advising, or encouraging any Sunder stakeholder to terminate its relationship with Sunder (the "Stakeholder Restriction").

The LLC agreement also imposes an expansive restriction on the use of Sunder's confidential information, broadly defined.

Each Covenant applies not only to the holder of the Incentive Unit but also to that person's "Affiliates," defined to include the holder's spouse, parents, siblings, and descendants, both natural and adopted. The Covenants thus purport to bind Jackson's wife and children. The Covenants apply during the period when the holder owns the Incentive Units and for two years afterward. A holder has no ability to transfer the Incentive Units, but Sunder can repurchase them for zero dollars if the holder is terminated or leaves other than for good reason. Because Sunder can decide not to repurchase the Incentive Units, the Covenants could be perpetual.

The Incentive Units are a form of incentive compensation. Jurisdictions other than Delaware have a significant interest in how businesses compensate employees and independent contractors and the extent to which businesses can attach restrictive covenants to those arrangements. Sunder has its headquarters in Utah, which has an obvious interest in that subject and has passed legislation to regulate it. Jackson lives in Texas, which has an interest in the extent to which its citizens can earn a living. Freedom has its headquarters in California, and Solar Pros has its headquarters in Nevada, so those jurisdictions have interests as well.

But Sunder filed suit here—in Delaware—because Sunder is a Delaware LLC and its lawyers deployed the now widespread legal technology of inserting restrictive covenants into an internal governance document. Businesses and their lawyers do that so they can invoke Delaware's contractarian regime and argue that it should override how other jurisdictions regulate restrictive covenants.

That legal technology calls on the Delaware courts to adjudicate post-employment disputes for the country and potentially the world. In the past five years alone, the Court of Chancery has issued written

14

decisions addressing disputes over restrictive covenants for businesses operating in Hong Kong,[1] Italy,[2] Alabama,[3] Arizona,[4] California,[5] Colorado,[6] Idaho,[7] Illinois,[8] Louisiana,[9] Nebraska,[10] New Jersey,[11] New York,[12] Oklahoma,[13] and Texas.[14] Only two businesses operated in

---

[1] *Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924 (Del. Ch. Jan. 4, 2023).

[2] *AlixPartners, LLP v. Mori*, 2022 WL 1111404 (Del. Ch. Apr. 14, 2022); *AlixPartners, LLP v. Mori*, 2019 WL 6327325 (Del. Ch. Nov. 26, 2019).

[3] *HighTower Hldg., LLC v. Gibson*, 2023 WL 1856651 (Del. Ch. Feb. 9, 2023); *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783 (Del. Ch. Mar. 27, 2020).

[4] *Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010 (Del. Ch. Aug. 30, 2019).

[5] *Gener8, LLC v. Castanon*, 2023 WL 6381635 (Del. Ch. Sept. 29, 2023); *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689 (Del. Ch. Sept. 1, 2023); *UBEO Hldgs., LLC v. Drakulic*, 2021 WL 1716966 (Del. Ch. Apr. 30, 2021); *Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939 (Del. Ch. 2020); *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784 (Del. Ch. 2020); *NuVasive, Inc. v. Miles*, 2020 WL 5106554 (Del. Ch. Aug. 31, 2020); *NuVasive, Inc. v. Miles*, 2019 WL 4010814 (Del. Ch. Aug. 26, 2019); *NuVasive, Inc. v. Miles*, 2018 WL 4677607 (Del. Ch. Sept. 28, 2018).

[6] *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104 (Del. Ch. June 20, 2019).

[7] *Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 5240507 (Del. Ch. Oct. 6, 2022).

[8] *Centurion Serv. Gp., LLC v. Wilensky*, 2023 WL 5624156 (Del. Ch. Aug. 31, 2023).

[9] *AG Res. Hldgs, LLC v. Terral*, 2021 WL 486831 (Del. Ch. Feb. 10, 2021).

[10] *Cabela's LLC v. Wellman*, 2018 WL 5309954 (Del. Ch. Oct. 26, 2018).

[11] *CelestialRX Invs., LLC v. Krivulka*, 2019 WL 1396764 (Del. Ch. Mar. 27, 2019).

[12] *Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236 (Del. Ch. Mar. 16, 2023); *Badger Hldg. LLC v. Kirsch*, 2018 WL 4709563 (Del. Ch. Oct. 1, 2018).

[13] *Parks v. Horizon Hldgs.*, LLC, 2022 WL 2821337 (Del. Ch. July 20, 2022).

[14] *U.S. Legal Support, Inc. v. Lucido*, 2021 WL 4940823 (Del. Ch. Oct. 22, 2021).

Delaware, one of which filed two cases.[15] That list excludes transcript rulings.

For Delaware courts to address these matters is problematic because the Delaware franchise depends on other states deferring to Delaware law to govern the internal affairs of the entities that Delaware charters. Delaware risks jeopardizing that deference if Delaware accommodates efforts to use the internal governance documents of its entities to override the law of other states on issues of great importance to them.[16]

For Delaware courts to address these matters is unsustainable because the Court of Chancery will never have sufficient resources to adjudicate restrictive covenant cases for Delaware entities throughout the world. The court's core role is to resolve internal governance disputes for Delaware entities. To Delaware's good fortune, the number of its entities has grown year over year. At the end of 2017, the starting point for the five-year lookback that this decision has used, Delaware had chartered more than 1.3 million entities.[17] At the end of 2022, there were over 1.9 million, reflecting aggregate growth of 46% and compound annual growth of nearly 8%. At that rate, the number of Delaware entities should easily crest 2 million in 2023.[18] Because some number of entities have disputes each year, more Delaware entities means more disputes. It thus should come as no surprise that the court's expansion from five to seven constitutional judges in 2018 was not a permanent fix. It enabled the court to meet 2018 demand, not future demand.

For the Court of Chancery to entertain restrictive covenant cases from far and wide diverts the court's attention from its core mission. And it generates considerably more work. As this case shows, restrictive covenant cases often start with an emergency application for a

---

[15] *Lyons Ins. Agency, Inc. v. Wark*, 2020 WL 429114 (Del. Ch. Jan. 28, 2020); *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606 (Del. Ch. Sept. 28, 2018); *Physiotherapy Corp. v. Moncure*, 2018 WL 1256492 (Del. Ch. Mar. 12, 2018).

[16] See *Diedenhofen-Lennartz v. Diedenhofen*, 931 A.2d 439, 451–52 (Del. Ch. 2007) ("If we expect that other sovereigns will respect our state's overriding interest in the interpretation and enforcement of our entity laws, we must show reciprocal respect.").

[17] Del. Div. of Corps., 2017 Annual Report, https://corp.delaware.gov/stats/2017-annual-report/ (last visited Nov. 20, 2023).

[18] Del. Div. of Corps., 2022 Annual Report, https://corp.delaware.gov/stats/ (last visited Nov. 20, 2023).

temporary restraining order, followed by a highly expedited motion for a preliminary injunction. Rulings on those preliminary matters do not end the case, which can continue to a trial on requests for permanent injunctive relief and damages. The factual issues are difficult because they frequently involve assertions about surreptitious activity and betrayal, and the discovery disputes regularly involve questions about spoliation. The legal questions are equally complex because they require determining what law applies, parsing dense contractual clauses, and balancing competing interests.

A solution needs to be found, and the market is unlikely to provide it. This is an area where Delaware's interests and the interests of its bar as a whole conflict with the individual interests of clients and their lawyers. For any single business, it makes sense for a lawyer to advise the client to embed restrictive covenants in an internal governance document. And for any single business faced with a dispute over those restrictions, it makes sense for a lawyer to advise the client to file a lawsuit in the Court of Chancery. In the aggregate, that is a recipe for a tragedy of the commons.

A judicial solution is also unlikely, because judges decide specific cases. Doubtless there are many combinations of fixes involving choice of law, personal jurisdiction, and subject matter jurisdiction that could address this burgeoning problem. But a cure requires the involvement of policymakers beyond the courts.

Injunction Decision at 1–6.

Three days later, on November 25, 2023, I posted the Policy Excerpt—but not any other part of the Injunction Decision—to my Linked-In account. I introduced the Policy Excerpt with the following explanation:

Thanks to a now widespread legal technology, the Court of Chancery is being asked to hear restrictive covenant cases brought by Delaware companies doing business around the country and the world. As described in this short excerpt from a recent decision, that trend is both problematic and unsustainable. Finding a solution likely requires the involvement of policymakers outside the courts. The issue cuts across multiple areas of the law. Although entity law and the internal affairs doctrine enable the technology to function, its effects implicate employment law, conflicts of law, horizontal federalism, and civil procedure. Hopefully some of the great minds out there can come up with answers that could help the court prioritize its core mission of

17

resolving internal governance disputes for Delaware entities, while reducing the extent to which the court's judicial resources are devoted to restrictive covenant cases that courts in other jurisdictions can hear just as (if not more) efficiently and effectively.

Dkt. 209, Ex. 1.

One week after that, on December 2, 2023, I posted a follow-up piece on my Linked-In account. I noted that after my earlier post, "I saw Professor John Coyle's post about his work on statutes that invalidate choice of law clauses and choice of forum clauses. He reports that Delaware already has two of the former and three of the latter." *Id.*, Ex. 2. Using ideas from Professor Coyle's work, I suggested high level amendments to 6 *Del. C.* § 2707 that could provide one method of limiting the restrictive covenant trend. *Id.*

Those comments did not come out of the blue. I began speaking about the trends identified in the Policy Excerpt in 2020. In a decision from that year, I described what I saw as a developing issue:

> Delaware court have confronted with increasing frequency situations in which parties have attempted to use choice-of-law provisions selecting Delaware law to bypass the substantive law of sister states. In this court, the conflicts most often involve agreements containing restrictive covenants. This court has also confronted a conflict between agreements selecting Delaware's contractarian regime and the substantive law of a foreign jurisdiction. Other Delaware courts have confronted similar issues in other contexts. Because Delaware's role as a chartering jurisdiction depends on other states deferring to the application of Delaware law to the internal affairs of entities, the increasing frequency with which parties use Delaware law to create conflicts with the substantive law of other jurisdictions raises significant public policy issues for this state.[19]

---

[19] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 802 n.4 (Del. Ch. 2020) (citations omitted).

In a decision issued the following month, I flagged similar concerns.[20]

The flow of restrictive covenant cases continued—even grew. So the following year, I identified the issue again in a transcript ruling.[21]

In 2022, Professor Ann Lipton blogged about the trend.[22] She later included a reference to the transcript ruling in an article detailing concerns about the expanding scope of the internal affairs doctrine.[23] But no one else seemed to notice.

And still the cases came, prompting me to revisit the trend in another transcript ruling.[24] I also believe I mentioned the trend at conferences when discussing the court's heavy workload, but I cannot offer any citations to support my recollection.

When the *Sunder* decision implicated the same issue, I elevated the Policy Excerpt to its position in the introduction. I also posted that section of the decision to my Linked-In account. With the exception of Professor Lipton, my earlier efforts to

---

[20] *See Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 956–57 (Del. Ch. 2020).

[21] *Strategic Funding Source Hldgs. LLC v. Kirincic*, C.A. No. 2021-0107-JTL, at 43–44 (Del. Ch. Sept. 22, 2021) (TRANSCRIPT).

[22] Ann M. Lipton, *New Challenges to the Internal Affairs Doctrine*, The CLS Blue Sky Blog (Dec. 19, 2022), https://clsbluesky.law.columbia.edu/2022/12/19/new-challenges-to-the-internal-affairs-doctrine/.

[23] *See* Ann Lipton, *Inside Out (or, One State to Rule them All): New Challenges to the Internal Affairs Doctrine*, 58 Wake Forest L. Rev. 321 (2023); *see also* Mohsen Manesh, *The Corporate Contract and the Internal Affairs Doctrine*, 71 Am. U. L. Rev. 501, 529–44 (2021).

[24] *See Iqvia Inc. v. Chalfant*, C.A. No. 2022-1194-JTL (Del. Ch. Oct. 19, 2023) (TRANSCRIPT).

raise awareness about the issue did not seem to have worked. I was trying again, and admittedly attempting to use a louder voice.

Sunder never states clearly why it believes the Policy Excerpt and my Linked-In posts are pertinent to the Application. Several possibilities exist.

One is that Sunder seeks to use the Policy Excerpt and my Linked-In posts to highlight the importance of the restrictive covenant issues for interlocutory appeal, hoping to distinguish its application from a run of the mill request. To that end, Sunder seems at times to suggest that the Injunction Decision decided a substantial issue *because* it is an example of the larger trend I have discussed.[25] But the fact that a larger trend has policy implications does not mean that a ruling in one particular case has significance. The restrictive covenant trend is problematic and unsustainable because of the volume of cases as a whole. If there were few restrictive covenant cases, then the effect on the court's workload would be marginal, and there would be minimal risk of other jurisdictions becoming concerned about Delaware courts treading on their police powers by determining whether to enforce restrictive

---

[25] App. ¶ 8 ("Giving additional context to the importance of the Decision is that [*sic*] fact that, since issuing the Decision, this Court has twice commented publicly that the trend of 'restrictive covenant cases brought by Delaware companies doing business around the country and the world' is 'both problematic and unsustainable.' Sunder respectfully submits that, under the present state of the law, the Court of Chancery is the only clear forum for the adjudication of disputes like this, despite a growing trend that appears to disfavor restrictive covenant litigation in the Court of Chancery. However, Sunder also respects and acknowledges this Court's perspective that the Court of Chancery faces a substantial docket, including restrictive covenant cases. The point is, this Court has issued an important Decision, and that Decision is worthy of the attention of the Delaware Supreme Court as soon as possible, without the need to wait until the end of a full trial (and before further restrictive covenant lawsuits are filed).").

covenants within their borders. The Injunction Decision is an individual case. The

Policy Excerpt does not make the case-specific issues it raises more or less significant.

A more cynical possibility is that Sunder cited the Policy Excerpt and Linked-

In posts to imply that my views on the larger policy issue biased my decision.[26] I

---

[26] For example, Sunder says:

> The Court found it "problematic" that cases like this one are brought in Delaware, however, and expressed that it would be "unsustainable" for the Court of Chancery to preside over cases like this, where a Delaware entity chose to include restrictive covenants in its operating agreement. The Court then held that Sunder could not enforce its Operating Agreement because it credited Jackson's allegations (which Mr. Jackson is currently seeking leave to assert) that Sunder's CEO and President breached their fiduciary duties by not explaining the Operating Agreement's terms to him.

App. ¶ 4 (citation omitted). The word "then" does a lot of work here. The Injunction Decision did not rely on the Policy Excerpt when analyzing the validity of the restrictive covenants, and thirty-three pages separated the Policy Excerpt (which ended on page 6) from the section titled "Lack of Enforceability Due To Breach of Duty" (which started on page 40). The latter did not depend on the former.

Sunder later appears to seek the same *post hoc ergo propter hoc* inference. In paragraphs 17 and 18 of its application, Sunder refers to the Policy Excerpt. In paragraph 19, Sunder sates, "[t]he Decision denied the PI Motion and its accompanying order dissolved the Renewed TRO." *Id.* ¶ 4. One did not lead to the other.

Sunder elsewhere says,

> Sunder respectfully submits that Delaware courts—at least absent legislative action, or a confirmation of the Decision—are the right place to adjudicate these disputes. If that is not the case, however, and this Court's indication that LLCs like Sunder should not enforce their rights in the Court of Chancery, then it serves Sunder, all Delaware LLCs, and the Court of Chancery itself to have a clear pronouncement to that effect.

*Id.* ¶ 7. That is why the Policy Excerpt observed that "a cure requires the involvement of policymakers beyond the courts," and that is why the Injunction Decision stated that even though the case might have been filed elsewhere, it was filed in Delaware and needed to be decided. Injunction Decision at 6–7.

Along similar lines, Sunder states, "Sunder respectfully disagrees that it is problematic to litigate a case like this before the Court of Chancery and respectfully submits

assume that was not Sunder's intent, but to avoid any doubt, I will address it: The views I expressed in the Policy Excerpt and Linked-In posts did not bias my consideration of the issues Sunder presented. As I said in the Injunction Decision, "[i]n an ideal world, this case would have been filed in Utah, Nevada, or Texas. But the case is here, and it must be decided." Injunction Decision at 7. I proceeded to decide the case on its merits, not as part of a larger, policy-driven push to limit the restrictive covenant cases brought in the Court of Chancery. Indeed, in my view, "a cure requires the involvement of policymakers beyond the courts." *Id.* at 6. This is not an area where I think judges—and particularly not trial judges—can help themselves.

Of course, I could be suffering from false consciousness. Looking to outward signals, my approach to this case does not suggest a bias against Sunder's positions. I granted Sunder's application for a TRO and its motion to expedite the case. Dkts. 10 & 11. I issued an order to show cause interpreting the TRO in a manner favorable to Sunder. Dkt. 22. I denied a motion to send Sunder's claims to arbitration. Dkt. 49. I renewed the TRO over the defendants' strong objections. Dkt. 52. I also set bond for Sunder at a comparatively modest level and required only partial security because I did not want a high bond to foreclose Sunder's ability to proceed. Dkt. 114. If I were

---

that the Decision provides the Supreme Court with an opportunity to weigh in on the important policy considerations surrounding restrictive covenant cases." App. ¶ 27. The Injunction Decision acknowledges that for any single company and counsel, it makes sense to recommend proceeding as Sunder did. The result of those rational decisions in the aggregate is what generates a tragedy of the commons. That is the issue that the Policy Excerpt flagged, and that is why after identifying that issue, I decided the application.

biased against Sunder's arguments, I did a poor job implementing those biases. And if I wanted to rid myself of the case, I blew it by not dismissing the complaint in favor of arbitration. Perhaps Sunder imagines that I did all that so I could work five long days—including over a weekend—to issue a big opinion containing the Policy Excerpt. There was no such plan.

An even more cynical possibility is that Sunder cited my Linked-In posts to imply a deeper charge of judicial impropriety. Again, I assume that was not Sunder's intent, and I address the possibility only to remove any doubt. Canon 4 permits a judge to engage in "activities to improve the law, the legal system, and the administration of justice."[27] That canon does not expressly address social media posts, but it says that "[a] judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice (including projects directed to the drafting of legislation)."[28] I included the Policy Excerpt to identify a need—in my opinion—"to improve the law, the legal system, and the administration of justice." I posted the Policy Excerpt after concluding that the post would fall within the category of writing concerning the law, the legal system, and the administration of justice. I reached the same conclusion about my second Linked-In post, which also related at a high level to the drafting of legislation.[29]

---

[27] Delaware Judges' Code of Judicial Conduct, Canon 4.

[28] *Id.*

[29] When I posted to my Linked-In account, I was careful only to reference the policy issues. *See* Delaware Judges' Code of Judicial Conduct, Canon 3, commentary (6) ("A judge

The Linked-In posts seem no different to me than the comments that my colleagues and I often provide at conferences about our workload, including the types of cases that contribute to it and possible solutions. The posts brought my comments to a larger audience than a Practicing Law Institute seminar, an American Bar Association event, or the Tulane Conference, but the content was the same. If I were to write a law review article and say the same things, I do not think anyone would complain. The medium may be different, but the canon operates similarly.

The Policy Excerpt and the Linked-In posts therefore do not demonstrate that the Injunction Decision addressed a substantial issue suitable for appeal. The Injunction Decision meets that test, but because of the rulings it made.

## B. Whether The Issues Merit Appellate Review Before A Final Judgment

A ruling addressing a substantial issue is a necessary but not sufficient condition for the certification of an interlocutory appeal. The trial court's ruling also must "merit[] appellate review before a final judgment." Supr. Ct. R. 42(b)(i). The Delaware Supreme Court has counseled that "[i]nterlocutory appeals should be exceptional, not routine, because they disrupt the normal procession of litigation, cause delay, and can threaten to exhaust scarce party and judicial resources." Supr. Ct. R. 42(b)(ii). When analyzing whether an issue merits appellate review before a final judgment, Rule 42(b)(iii) instructs trial courts to consider eight factors. Sunder relies on three.

should abstain from public comment on the merits of a pending or impending proceeding in any court.").

### 1. Whether Review Would Serve Considerations Of Justice

Sunder's application succeeds by relying on the catchall eighth factor, which asks whether "[r]eview of the interlocutory order may serve considerations of justice." Supr. Ct. R. 42(b)(iii)(H). In addressing this factor, I acknowledge that "the grant or denial of a preliminary injunction is, itself, highly discretionary and where, as here, the denial of injunctive relief is based on a finding that the plaintiff has failed the burden of proving ultimate success, review [under Rule 42] is rarely granted." *Wilm. Sav. Fund Soc'y, FSB v. Covell*, 577 A.2d 756, 1990 WL 84687, at *1 (Del. May 16, 1990) (ORDER). Because injunction decisions are not ordinarily suitable for interlocutory review, my reliance on the eighth factor requires some explanation.

As discussed previously, the rulings in the Injunction Decision effectively rejected both Sunder's right to enforce its restrictive covenants against Jackson and its ability to sue the Freedom Defendants for tortious interference. Those rulings are akin to a decision granting a motion to dismiss, which results in a final judgment that gives rise to an immediate appeal.

The Injunction Decision did not reject all of Sunder's claims, and Sunder could continue to trial on theories limited to Jackson's pre-resignation conduct. That litigation, however, would be very different than the case Sunder wants to pursue. The scope of fact and expert discovery would be narrower, the trial would be limited, and Sunder's potential remedies would be constrained.

The Injunction Decision is therefore more like a Rule 12(b)(6) decision that dismisses the bulk of a case, but permits one comparatively narrow claim to proceed. In that setting, entry of a partial final judgment under Rule 54(b) likely would be

warranted. That rule states that "[w]hen more than 1 claim for relief is presented in an action, … the Court may direct the entry of a final judgment upon 1 or more but fewer than all of the claims or parties only upon an express determination that there is not just reason for delay and upon an express direction for the entry of judgment." When a motion to dismiss has resolved the bulk of the case, it is at least worth considering entry of a partial final judgment under Rule 54(b), rather than litigating the case to the end before the plaintiff can appeal. If the proceedings on the remaining claims are comparatively focused and distinct, then moving forward with the case makes more sense. But if an appeal at the end of the case would require a complete do-over, then entry of a partial final judgment could well be warranted.

The current posture of this case thus resembles a scenario in which a court has granted a motion to dismiss that disposes of the bulk of the claims, but where litigation on the remaining claims necessarily overlaps with the dismissed claims. To pick somewhat arbitrary percentages, if the case Sunder hoped to pursue encompassed 100% of the factual, expert, and legal issues, then what remains will involve perhaps 20%. Litigating that case will be costly, and yet if the Delaware Supreme Court were to reverse the rulings in the Injunction Decision after a final judgment, then everyone will have to start over for a complete re-do.

There is a significant benefit to an appeal now. Receiving the Delaware Supreme Court's views on the legal issues will establish the shape of the case for purposes of discovery and trial, enabling the parties and me to proceed in conformity with those views. Having final answers on those legal questions negates the risk that

26

the parties and I could expend significant efforts litigating the case through a post-trial decision, only for the justices to hold that Sunders' claims for breach of the restrictive covenants should have gone forward because legal issues were outcome-determinative on key defenses.[30]

Although that means the Delaware Supreme Court would hear the appeal now, the high court will likely have to hear an appeal on these issues in any event. Sunder is not likely to go away. They previously rejected a $10 million offer from Freedom to release Jackson from his restrictive covenants and transition his team. They have maintained that Jackson's actions are causing them irreparable harm. They seem committed to pushing the case to the end, meaning that the justices will likely have to address the issues raised by the Injunction Decision at some point. If the justices entertain the appeal now, then their effort will not be wasted, because those rulings will be law of the case.

My experience with the *Stream TV* litigation informs my view on how considerations of justice affect the timing of the appeal. There, as here, I denied a preliminary injunction application, which in that case allowed a transaction to cbetween a debtor and its secured creditor.[31] No one sought interlocutory review. For over a year, the case continued at my level, with the creditor-buyer operating the

---

[30] *E.g.*, *Boardwalk Pipeline P'rs, LP v. Bandera Master Fund LP*, 288 A.3d 1083, 1088 (Del. 2022) (reversing lengthy post-trial decision following multi-year litigation based on two issues of law); *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 502 (Del. 2019) (reversing lengthy post-trial decision in multi-year litigation based on issue of law).

[31] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020).

assets and investing in the business. After replacing counsel, the plaintiff moved for partial summary judgment, resulting in a Rule 54(b) order and an appeal.[32] After another six months, the Delaware Supreme Court reversed on one point of law, which was sufficient to render the transaction agreement void.[33] That reversal triggered an avalanche of complex issues, including how to rescind the transaction and unwind nearly two years' of operational decisions, along with efforts by the company's secured creditors to obviate that result. On remand, I confronted a series of expedited motions, and I appointed a receiver to get a handle on the factual complexities.[34] The

---

[32] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5816820 (Del. Ch. Dec. 8, 2021), *rev'd in part, vacated in part*, 279 A.3d 323 (Del. 2022).

[33] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022).

[34] *E.g.*, *Hawk Inv. Hldgs., Ltd. v. Mediatainment, Inc.*, 2023 WL 3099122 (Del. Ch. Apr. 26, 2023) (ORDER) (order granting motion to dismiss); *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2023 WL 3099113 (Del. Ch. Apr. 26, 2023) (ORDER) (order denying motion to dismiss); *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2023 WL 3099112 (Del. Ch. Apr. 26, 2023) (ORDER) (order denying motion to intervene); *Hawk Inv. Hldgs. Ltd. v. Stream TV Networks, Inc.*, 2023 WL 1963091 (Del. Ch. Feb. 10, 2023) (ORDER) (order granting motion to file amended complaint); *Hawk Inv. Hldgs. Ltd. v. Stream TV Networks, Inc.*, 2023 WL 1816922 (Del. Ch. Feb. 4, 2023) (ORDER) (order granting motion to set cash bond); *Hawk Inv. Hldgs. Ltd. v. Stream TV Networks, Inc.*, 2022 WL 17661578 (Del. Ch. Dec. 14, 2022) (ORDER) (order denying motion for reargument); *Hawk Inv. Hldgs. Ltd. v. Stream TV Networks, Inc.*, 2022 WL 17258460 (Del. Ch. Nov. 29, 2022) (memorandum opinion granting partial summary judgment); *In re Stream TV Networks, Inc. Omnibus Agr. Litig.*, 2022 WL 16860930 (Del. Ch. Nov. 9, 2022) (ORDER) (order granting motion to intervene); *Hawk Inv. Hldgs. Ltd. v. Stream TV Networks, Inc.*, 2022 WL 16860942 (Del. Ch. Nov. 9, 2022) (ORDER) (order denying motion to compel); *Hawk Inv. Hldgs. Ltd. v. Stream TV Networks, Inc.*, 2022 WL 12615549 (Del. Ch. Oct. 20, 2022) (ORDER) (status quo order); *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL 11388785 (Del. Ch. Oct. 19, 2022) (ORDER) (order denying motion for contempt); *In re Stream TV Networks, Inc.*, 2022 WL 10029844, at *1 (Del. Ch. Oct. 14, 2022) (ORDER) (order addressing motion for clarification); *In re Stream TV Networks, Inc. Omnibus Agr. Litig.*, 283 A.3d 1183 (Del. Ch. 2022) (opinion imposing sanction for contempt); *In re Stream TV Networks, Inc. Omnibus Agr. Litig.*, 2022 WL 4989617 (Del. Ch. Oct. 3, 2022) (ORDER) (order denying emergency motion to enforce order); *In re Stream TV Networks, Inc. Omnibus Agr. Litig.*, 2022 WL 4772886 (Del. Ch. Sep. 30, 2022) (ORDER) (order denying application for mandatory injunction); *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL

28

dispute eventually shifted to the bankruptcy court, where (to my knowledge) it continues.[35]

If only I had known about my error shortly after denying the preliminary injunction, so much work and so many headaches might have been avoided. Sadly, no one sought an appeal at that time, so there was no vehicle for obtaining timely insight into the Delaware Supreme Court's views. Here, Sunder seeks that insight. My experience in the *Stream TV* case suggests that having those views will be highly beneficial such that considerations of justice warrant interlocutory review.

## 2. Whether Decisions Of The Trial Courts Conflict

Another factor that Sunder cites weakly supports interlocutory review. Rule 42 calls on a trial court to consider whether "[t]he decisions of the trial courts are conflicting upon the question of law." Supr. Ct. R. 42(b)(iii)(B). Sunder argues that "[o]ver the past few years, there has been a growing trend that disfavors restrictive

---

4398448 (Del. Ch. Sep. 22, 2022) (ORDER) (order denying application for special master); *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL 4356510 (Del. Ch. Sep. 16, 2022) (ORDER) (order denying application to modify temporary restraining order); *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL 4356514 (Del. Ch. Sep. 16, 2022) (ORDER) (order granting motion for costs); *In re Stream TV Networks, Inc. Omnibus Agr. Litig.*, 2022 WL 4491925 (Del. Ch. Sept. 28, 2022) (memorandum opinion declining to modify partial final judgment); *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL 3283863 (Del. Ch. Aug. 10, 2022) (ORDER) (order granting motion for partial final judgment implementing Delaware Supreme Court decision); *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL 3227785 (Del. Ch. Aug. 9, 2022) (ORDER) (order granting motion for temporary restraining order); *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL 2902646 (Del. Ch. July 20, 2022) (ORDER) (order granting status quo order); *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2022 WL 17970594 (Del. Ch. July 5, 2022) (ORDER) (order granting motion to amend).

[35] The Delaware Supreme Court's decision also prompted the General Assembly to amend the Delaware General Corporation Law. *See* 2023 Del. Laws ch. 98 (2023) (S.B. 114) (amending 8 *Del. C.* § 272).

covenant litigation in the Court of Chancery."[36] Sunder posits that this "stands in contrast to prior longstanding Delaware case law that was less reluctant to blue pencil restrictive covenants."[37] Sunder argues that the Delaware Supreme Court should have the ability to weigh in on this question.

Sunder has not pointed to any direct conflicts between trial-level decisions. Candidly, however, there is a sense in which Delaware decisions over the past decade have paid greater attention to the real-world effects of restrictive covenants, the bargaining dynamics in which they arise, and the incentives employers have to include ever more favorable provisions in their form agreements. There has also been a growing societal understanding regarding the implications of restrictive covenants which has led to more jurisdictions limiting their use, as well as federal initiatives. From a big picture standpoint, it does seem like more recent Delaware decisions have been less likely to enforce the full scope of restrictive covenants and related provisions designed to protect them from challenge (such as stipulations as to reasonableness and blue-penciling requirements). The difference is a matter of degree, because prior decisions considered these factors as well.[38] The difference also may stem from the

---

[36] App. ¶ 36. In addition to the Injunction Decision, Sunder cites *Centurion Services Gp., LLC v. Wilensky* (Del. Ch. Aug. 31, 2023), and *Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924 (Del. Ch. Jan. 4, 2023).

[37] App. ¶ 36. Sunder cites *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *11-13 (Del. Ch. Oct. 23, 2002); *RHIS, Inc. v. Boyce*, 2001 WL 1192203, at *1 (Del. Ch. Sept. 26, 2001); *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998).

[38] *See, e.g.*, *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *10–11 (Del. Ch. Mar. 16, 2011); *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *4 (Del. Ch. June 2, 2006); *TriState Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *15 (Del. Ch. Apr. 15, 2004).

fact that the provisions have simply become more onerous over time. But at a high-level, Sunder's impression is not unfounded.

If the Delaware Supreme Court wants this court to afford less significance to context, defer to provisions designed to protect covenants from challenge, enforce broad restrictive covenants as written, and generally prioritize contract law over equity in this setting, then it would be helpful to know that. But because the Delaware Supreme Court could provide that guidance just as easily in an appeal from a final judgment, this factor only weakly supports the Application. What warrants interlocutory appeal in this case is that *when* the justices provide guidance makes a difference, not whether they provide guidance.

### 3. Whether Review May Terminate The Litigation

A final factor that Sunder cites does not support interlocutory review. Rule 42 asks the trial court to consider whether "[r]eview of the interlocutory order may terminate the litigation." Supr. Ct. R. 42(b)(iii)(G). According to Sunder, "if the Court reverses the Decision and finds that Sunder's contract claims are valid, there would be little need to continue the litigation, as the Court has already found that Sunder has proven that Jackson violated both Covenants." App. ¶ 41. Not so.

If the Delaware Supreme Court were to reverse the Injunction Decision and uphold the full breadth of the restrictive covenants, then there are numerous issues that remain to be litigated. True, the restrictive covenants are sufficiently expansive that Jackson would be in breach. But the Delaware Supreme Court's ruling would not be enough to trigger the issuance of a preliminary injunction, much less a permanent injunction or an award of damages. The issue of causation looms large,

31

and the balancing of the hardships has not yet been addressed. The parties have done nothing on the damages front.

Thus, rather than there being "little need to continue the litigation," the case would go on, and there would still be a lot to do. This factor therefore does not favor certifying an interlocutory appeal.

## C.     The Balancing

As a final step, Rule 42 directs the trial court to engage in balancing:

> After considering [the eight] factors and its own assessment of the most efficient and just schedule to resolve the case, the trial court should identify whether and why the likely benefits of interlocutory review outweigh the probable costs, such that interlocutory review is in the interests of justice. If the balance is uncertain, the trial court should refuse to certify the interlocutory appeal.

Supr. Ct. R. 42(b)(iii). There must be "substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal." *Id.*

In this case, the balancing supports interlocutory review. Although the Injunction Decision denied a request for preliminary relief, the posture of the case is more analogous to a ruling dismissing the bulk of a plaintiff's claims where a court would enter a partial final judgment under Court of Chancery Rule 54(b). Admittedly, certifying an interlocutory appeal and entering partial final judgments are different things, but they both facilitate an early appeal. The same considerations that would warrant entry of a partial final judgment support granting the Application.[39]

---

[39] Using a trial court's power to manage its docket, I likely could maneuver this case into a posture where I could enter final judgments under Rule 54(b). "Delaware trial courts have inherent power to control their dockets." *Solow v. Aspect Res., LLC*, 46 A.3d 1074, 1075 (Del. 2012). That authority includes determining how to proceed for the "orderly adjudication

As discussed previously, an interlocutory appeal is preferable at this stage because it will generate substantial benefits for the parties and the trial court, while the costs of an appeal are likely to be incurred regardless. With definitive answers on key legal issues, the parties and the trial court can determine the scope of the case going forward. While an appeal on those issues is likely in any event, if that appeal happens at the end of the case, then reversal will require a complete do-over. If the appeal happens now, then the case can be litigated in conformity with the Delaware Supreme Court's rulings.

## III.    CONCLUSION

Ultimately, whether to permit an interlocutory appeal lies in the discretion of the Delaware Supreme Court. The justices' views, not mine, determine whether

of claims." *Unbound P'rs Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1030 (Del. Super. 2021) (cleaned up). Rule 1 instructs the members of this court that the rules "shall be construed, administered, and employed by the Court and the parties, to secure the just, speedy and inexpensive determination of every proceeding." Ct. Ch. R. 1. Commenting on the sibling federal rule, a leading treatise states that "[t]here probably is no provision in the federal rules that is more important than this mandate. It reflects the spirit in which the rules were conceived and written, and in which they should be interpreted." 4 Charles Alan Wright, Arthur R. Miller & Adam N. Steinman, *Federal Practice and Procedure* § 1029 (4th ed.), Westlaw (database updated Apr. 2023). Court of Chancery Rule 16(a) similarly contemplates that a court may take steps to "formulat[e] and simplif[y] ... the issues" and to address "[s]uch other matters as may aid in the disposition of the action." *Id.* 16(a)(1), (5). The same authoritative treatise explains that "case management [is] an express goal of pretrial procedure." 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane*, Federal Practice and Procedure* § 1521 (3d ed.), Westlaw (database updated Apr. 2023). To that end, the Advisory Committee's note to the federal rule emphasizes the need for "a process of judicial management that embraces the entire pretrial phase." Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment. The commentary recognizes that "[t]he timing of any attempt at issue formulation is a matter of judicial discretion." *Id.* Exercising this authority, I could direct either or both sides to file and brief motions for summary judgment that could result in orders suitable for entry under Rule 54(b). The purpose of doing that would be to set up an appeal (which the Delaware Supreme Court still could reject). It seems more transparent to grant the Application and recommend acceptance of an interlocutory appeal.

33

Sunder's request will be granted. This court's role under Rule 42 is to make a recommendation. In this case, my recommendation is for the Delaware Supreme Court to accept the interlocutory appeal.